# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MEDICALGORITHMICS S.A., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10948-CB |
| | ) | |
| AMI MONITORING, INC. d/b/a | ) | |
| SPECTOCOR and SPECTOCOR LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDICALGORITHMICS S.A., | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 10, 2016
Date Decided:  August 18, 2016

Philip Trainer, Jr. and Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Madlyn Gleich Primoff, Daniel Reisner, Michael Lynn and Kyle D. Gooch, KAYE SCHOLER LLP, New York, New York; *Attorneys for Plaintiff*.

Blake Rohrbacher, Kelly E. Farnan, Robert L. Burns, Rachel E. Horn, Thomas R. Nucum and Brian F. Morris, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants*.

**BOUCHARD, C.**

In 2011, Medicalgorithmics S.A. and AMI Monitoring, Inc. entered into a Strategic Alliance Agreement under which AMI received an exclusive license to market and distribute in the United States a cardiac monitoring device that Medicalgorithmics invented. A critical term of the agreement, which was updated in 2014, prohibited AMI from seeking or developing a product to replace the Medicalgorithmics device unless AMI first provided a notice of termination, which would begin a two-year period at the end of which the remaining obligations under the agreement would expire. The purpose of this provision was to deter AMI, Medicalgorithmics' exclusive licensee in the United States, from seeking to develop or use a competing device and to afford Medicalgorithmics a two-year runway to transition to another distributor if it did.

In this post-trial decision, I conclude that AMI materially breached the Strategic Alliance Agreement by no later than April 2014 by secretly seeking to develop a device for use in the United States to replace the Medicalgorithmics device without first providing the required notice to Medicalgorithmics. Because of AMI's material breach, Medicalgorithmics' later termination of the agreement was valid, and it is entitled to damages, although significantly less than it sought at trial. Medicalgorithmics also is entitled to recover its attorneys' fees and costs for this litigation under an indemnification provision in the agreement, and to judgment in its favor dismissing AMI's counterclaims.

## I.    BACKGROUND

The facts recited in this opinion are my findings based on the stipulations of the parties, documentary evidence, and testimony presented during a five-day trial during which seven fact and three expert witnesses testified. I accord the evidence the weight and credibility I find it deserves.

### A.    The Parties

Plaintiff and counterclaim defendant Medicalgorithmics S.A. is a public company incorporated and headquartered in Poland.[1] Medicalgorithmics is the developer and manufacturer of a remote cardiac monitoring system known as the PocketECG, a medical device marketed in the United States under a premarket clearance from the United States Food and Drug Administration. Medicalgorithmics holds the intellectual property rights to the PocketECG.[2] Marek Dziubinski, the founder and CEO of Medicalgorithmics,[3] invented the PocketECG technology.[4]

---

[1] PTO ¶ 10.

[2] PTO ¶ 13-14.

[3] Tr. 5 (Dziubinski).

[4] Tr. 7-8 (Dziubinski).

Defendant and counterclaim plaintiff AMI Monitoring, Inc. ("AMI") is a privately held corporation incorporated and headquartered in Texas.[5] Joseph Bogdan ("Joe") founded AMI in 2002 and serves as its President.[6] Defendant Spectocor LLC is a limited liability company organized under Nevada law and headquartered in Texas. Joe is Spectocor's sole managing partner.[7] AMI and Spectocor run cardiac monitoring centers known as independent diagnostic testing facilities.[8] At the times relevant to this action, Joe owned and controlled both Spectocor and AMI, which were operated in a coordinated fashion as a single business. For simplicity, I generally refer to both entities interchangeably as "AMI."

Non-party Medi-Lynx Cardiac Monitoring, LLC is a competitor of AMI that was formed in 2013 after disagreements arose between Joe and his brother, Andrew Bogdan ("Andy"), who were the original co-owners of AMI. Andy currently serves as President of Medi-Lynx.[9]

---

[5] PTO ¶ 11.

[6] PTO ¶ 11. I refer to the Bogdan brothers in this opinion by their first names to avoid confusion. No disrespect is intended.

[7] PTO ¶ 12.

[8] Tr. 28-29 (Dziubinski).

[9] Tr. 855 (Andy).

3

## B. The PocketECG Technology

The PocketECG is a system for diagnosing heart arrhythmia that Medicalgorithmics sells to its licensees around the world.[10] Medicalgorithmics has manufactured two versions of the PocketECG: the PocketECG II and the PocketECG III.[11] The PocketECG II is a Bluetooth device that a patient wears. It transmits electrocardiography ("ECG")[12] data digitally via Bluetooth to an off-the-shelf smartphone, which then processes the ECG signal using an algorithm designed by Medicalgorithmics and uploads the data to a remote server.[13] The PocketECG III contains the smartphone technology within the device, avoiding the need for a separate off-the-shelf smartphone device.[14]

The PocketECG devices are known as 3-in-1 devices because they offer three types of cardiac monitoring services: Holter, event monitoring, and mobile cardiac telemetry ("MCT").[15] Holter is the oldest of the three methods and the most commonly used method worldwide. Holter involves recording a continuous ECG signal for 24 to 48 hours and downloading the data to a computer for

---

[10] Tr. 5-6 (Dziubinski).

[11] PTO ¶ 15.

[12] Tr. 1243 (Scher).

[13] Tr. 10 (Dziubinski).

[14] Tr. 12 (Dziubinski).

[15] Tr. 19 (Dziubinski).

subsequent analysis. Event monitoring is a longer process, lasting up to 30 days, during which time the device transmits only certain fragments of the ECG signal arising during noteworthy events or symptoms, and discarding the remaining data. MCT also provides intermittent monitoring but frequently sends transmissions, which are then classified as being an arrhythmia or not an arrhythmia.[16] The 3-in-1 designation is a creature of the United States healthcare insurance market, in which all three methods are reimbursable. Mobile cardiac telemetry is largely unknown elsewhere in the world.[17]

Cardiac monitoring services using the PocketECG and similar devices are provided through independent diagnostic testing facilities such as AMI, which receive the data and have cardiac technicians provide diagnostic reports to the patient's physician.[18] Private insurers or Medicare reimburse these facilities for providing the device and the diagnostic services to the patient.[19] The amount of reimbursement depends on which of the three services is used, with mobile cardiac telemetry receiving a significantly higher level of reimbursement.[20]

---

[16] Tr. 19-21 (Dziubinski); Tr. 321-24 (Moss).

[17] Tr. 21 (Dziubinski); Tr. 320-21, 376-77 (Moss).

[18] Tr. 325 (Moss); Tr. 23-25 (Dziubinski).

[19] Tr. 24-25 (Dziubinski).

[20] Tr. 25-26 (Dziubinski) (noting that telemetry is reimbursed at a rate of approximately ten times the reimbursement rate for Holter monitoring).

### C. Medicalgorithmics and AMI Enter into Business Together

In May 2009, Medicalgorithmics received approval from the FDA to market the PocketECG in the United States under Section 510(k) of the Food, Drug, and Cosmetic Act.[21] After receiving this approval, Medicalgorithmics contacted different independent diagnostic testing facilities, including AMI, about working together to provide PocketECG devices in the United States.[22] At the time, Joe and Andy were 50/50 co-owners of AMI,[23] and Medi-Lynx did not yet exist.[24] In 2010, AMI and Medicalgorithmics began working together on a non-exclusive basis, with AMI purchasing PocketECG devices from Medicalgorithmics.[25]

During this period, the parties discussed possible business arrangements, including the possibility of AMI purchasing Medicalgorithmics[26] as well as an exclusive licensing arrangement between Medicalgorithmics and AMI. Joe's goal was to have AMI either "own or uniquely license" a mobile cardiac telemetry device like the PocketECG in order to stand out in the monitoring community.[27]

---

[21] JX-817 at 4.

[22] Tr. 28-29 (Dziubinski).

[23] Tr. 858 (Andy); Tr. 29 (Dziubinski);

[24] Tr. 880 (Andy).

[25] Tr. 29-30 (Dziubinski); Tr. 453 (Joe).

[26] Tr. 453 (Joe); JX-6.

[27] Tr. 449 (Joe).

Ultimately, the companies went the route of an exclusive licensing agreement. It was "very important" to Joe that the agreement would be exclusive in the United States.[28]

In late 2011, AMI and Medicalgorithmics negotiated a strategic alliance agreement under which AMI would become the exclusive licensee of the PocketECG in the United States.[29] At the end of December, Medicalgorithmics and AMI completed negotiations and signed the agreement (the "2011 SAA").[30] As discussed below, the 2011 SAA was updated in 2014 (the "2014 SAA") after Joe and Andy split, but the key provisions relevant to this dispute remained substantively identical.[31] The 2011 SAA and the 2014 SAA are sometimes referred to together as the "SAA" or "SAAs."

Section 3.3 of the SAA restricts AMI from seeking or developing technology that would replace Medicalgorithmics' products, such as the PocketECG, without first providing notice of termination:

> Without first providing notice of termination of this Agreement to Supplier [Medicalgorithmics], Buyer [AMI] agrees that it shall not

---

[28] Tr. 455 (Joe).

[29] Tr. 30-32 (Dziubinski).

[30] JX-38 ("2011 SAA") at 17.

[31] *See* JX-248 ("2014 SAA") §§ 3.3, 7.1, 10.1, Attachments 1 & 2.

7

seek, develop, engage, promote or market any technology to replace Supplier's products or services.[32]

This provision was the result of arm's-length negotiations. Medicalgorithmics added the restriction (without the notice of termination exception) after AMI requested exclusivity,[33] and the parties eventually agreed on the language quoted above, which included the option to extinguish the restriction by providing prior notice of termination. The evident purpose of Section 3.3 was to deter AMI—Medicalgorithmics' exclusive licensee in the United States—from seeking to make or use a competing product, and to afford Medicalgorithmics a two-year period to make arrangements to transition to another distributor if AMI nevertheless did so.

Under Section 7.1, AMI could terminate the SAA by providing Medicalgorithmics with written notice 24 months in advance.[34] Thus, reading Sections 3.3 and 7.1 together, AMI could extinguish the restrictions of Section 3.3 immediately by providing a written notice of termination, thereby allowing AMI to begin product development otherwise restricted under Section 3.3, but termination of its remaining obligations under the agreement would not become effective until 24 months later under Section 7.1. Such continuing obligations included AMI's

---

[32] 2011 SAA § 3.3.

[33] JX-18 § 3.3 (redline of draft SAA); Tr. 31-33 (Dziubinski) (explaining that Medicalgorithmics added protections to the draft SAA, including Section 3.3, in response to Joe's request that the agreement be exclusive).

[34] 2011 SAA § 7.1.

agreement to "solely use" Medicalgorithmics' products for all diagnostic work AMI was capable of performing,[35] and to achieve certain minimum growth targets for active PocketECG devices.[36]

Section 10.1 of the SAA sets forth Medicalgorithmics' delivery requirements:

> 1. Fill Buyer's orders for Products within thirty (30) days in a professional manner and shall advise Buyer as soon as possible if it appears that Supplier may not be able to fill Buyer's orders for any reason, or of any delay or anticipated delay in delivery or performance. Supplier shall be required to maintain a reasonable inventory (the percentage of inventory should equal the % growth requirements within this agreement) to satisfy orders within thirty (30) days of request by Buyer. Failure of Supplier to fulfill buyer's order for Products not exceeding 1000 units within sixty (60) days, assuming the orders are not made more frequently than every sixty (60) days, or any number of units in hundred and twenty (120) days, assuming such orders are not made more frequently than every hundred and twenty (120) days, is a material breach of this Agreement subjecting the Agreement to immediate termination at the discretion of Buyer.[37]

Attachment 1 to the SAA specifies that the product to be sold under the agreement is the PocketECG II model and provides technical specifications relevant to that model.[38] Attachment 1 also specifies that "[p]erformance of

---

[35] *Id.* ¶ 9 ("Buyer agrees to solely use Supplier's products for all diagnostic work the Products are capable of performing at the time of this Agreement . . . .").

[36] *Id.* at Attachment 3 (Cumulative Product Activation Targets).

[37] *Id.* § 10.1.

[38] *See id.* at Attachment 1.

subsequent versions may differ from those presented. The New devices may also have other or additional functionalities."[39] Under the SAA, the "Product" that is the subject of the agreement includes "any variations, advancements, improvements, or modifications made to the Product during the term of this Agreement."[40] The 2011 SAA envisioned the eventual creation of an all-in-one device such as the PocketECG III. Specifically, Medicalgorithmics' "Continuous Improvement" commitments under the 2011 SAA included a 2012 task of creating a fully-functional prototype of an integrated all-in-one PocketECG device, and a 2013 task of receiving FDA approval for said device.[41]

Payment terms for the PocketECG II were included in Attachment 2 to the 2011 SAA. For instance, each PocketECG II order required a prepayment of $303 per device. That amount would be credited toward the monthly service fees paid to Medicalgorithmics for using the devices, which were calculated using a formula, also contained in Attachment 2, that assessed charges based on the number of Holter, event, and telemetry sessions that were undertaken each month.[42]

---

[39] *Id.* at Attachment 1.

[40] *Id.* ¶ 2.

[41] *Id.* § 3.1(n), (r). These tasks, including the years in which they were to be achieved, remained the same in the 2014 SAA even though that agreement was signed after the timelines envisioned for the tasks had passed. 2014 SAA § 3.1(n), (r).

[42] 2011 SAA at Attachment 2.

### D. Joe and Andy Split Up AMI's Business

By 2013, significant disagreements had developed between Joe and Andy about AMI's business and how best to manage it.[43] In mid-2013, Andy informed Joe that he wanted to leave AMI.[44] In June, he let Medicalgorithmics know the same in an e-mail stating that he would be selling his 50% stake either to Joe or to a third party and encouraging Medicalgorithmics to consider buying his stake.[45] That sale did not materialize. Instead, the brothers ended up splitting the business in two, with Joe owning AMI/Spectocor and Andy owning a new business called Medi-Lynx Monitoring, Inc.[46] Each business was to become a co-exclusive licensee of the PocketECG, thus requiring Medicalgorithmics to sign new license agreements.[47] The separation was troubling to Dziubinski, who recalled the difficulties Medicalgorithmics had experienced with AMI early in their relationship and worried that it would experience similar growing pains with Medi-Lynx.[48]

---

[43] Tr. 507-10 (Joe); Tr. 872-79 (Andy).

[44] Tr. 509 (Joe).

[45] JX-146 at 1; Tr. 58-59 (Dziubinski).

[46] *See generally* JX-246 (Agreement and Plan of Separation).

[47] Tr. 59 (Dziubinski); 2014 SAA; JX-249.

[48] Tr. 59-60 (Dziubinski).

Despite these reservations, Medicalgorithmics proceeded with the brothers' now-separate businesses and signed separate strategic alliance agreements with AMI and with Medi-Lynx on January 2, 2014.[49] Because AMI and Medicalgorithmics already were working under the 2011 SAA, the primary change reflected in the 2014 SAA was to update the licensing provisions such that AMI became a co-exclusive U.S. licensee of the PocketECG with Medi-Lynx, rather than the sole exclusive U.S. licensee as it was under the 2011 SAA.

## E.    The PocketECG III

In July 2013, before the 2014 SAA had been entered, Medicalgorithmics sent AMI a draft amendment to the 2011 SAA regarding pricing for the new PocketECG III model it was developing.[50] The PocketECG III would be a 3-in-1 device like the PocketECG II, but unlike the PocketECG II, it would integrate the data transmission technology into the device so that a separate smartphone would not be required to transmit the patient's data. The proposed amendment required a prepayment of $505, an increase from the $303 required for the PocketECG II under the 2011 SAA.[51] As with the PocketECG II, the first $303 of the prepayment would be credited against the device's monthly service charges

---

[49] 2014 SAA; JX-249 (the "Medi-Lynx 2014 SAA").

[50] JX-156 at 1.

[51] *Id.* at 3.

12

beginning when the unit is activated.[52]  The remaining $202 would be an additional cost for AMI, although it presumably would be offset by some savings from avoiding the purchase of a separate smartphone device.[53]

Medicalgorithmics anticipated, and AMI acknowledged, that the PocketECG III devices would require more time to manufacture—initially five months, compared to the three-month timeframe of the PocketECG II—although it planned to bring the production timeline for the PocketECG III down to three months within a year.[54]  Medicalgorithmics also knew that the technology would take time to perfect, and it informed AMI that the technology would need to be released gradually to work out bugs without causing significant damage to the business.[55]

Medicalgorithmics was concerned that AMI was facing liquidity constraints that could make it difficult for AMI to make prepayments for the new PocketECG III devices, particularly given the distractions the brothers' splitting of the business had caused.[56]  Medicalgorithmics came up with a way to ship PocketECG III

---

[52] *Id.* at 3.

[53] AMI alleges these savings were not necessarily significant because the wireless carrier sometimes provided phones at no charge, depending on how a given deal was negotiated. Tr. 1142-44 (Velez).

[54] JX-171 at 2-3.

[55] Tr. 73-74 (Dziubinski).

[56] Tr. 73-75 (Dziubinski).

devices to AMI without receiving the $505 prepayment fee required under Attachment 2 of the SAA. By charging interest, Medicalgorithmics could essentially turn the prepayment fee into a loan, allowing AMI to make the payment 90 days after delivery, with a modest premium of $8.83 per device reflecting the accrued interest, for a total cost of $513.83.[57] Joe responded enthusiastically to this proposal.[58] Unlike with the PocketECG II, Medicalgorithmics required signed purchase orders in light of the fact that it was manufacturing devices for AMI without receiving any prepayment.[59]

On November 13, 2013, in accordance with this arrangement and without making a prepayment, AMI e-mailed Medicalgorithmics four purchase orders, each of which sought 1,000 PocketECG III devices, to be delivered in April, May, June, and July, 2014, respectively.[60] In total, this order requested four times as many devices as the 1,000 PocketECG III units AMI initially had requested in August, before Medicalgorithmics gave AMI the prepayment workaround.[61] The order form Medicalgorithmics provided did not contain a delivery date field, but

---

[57] JX-190; Tr. 74-77 (Dziubinski).

[58] JX-190 ("Thank you! That sounds great and resolves the upfront pricing on so many units.").

[59] Tr. 79 (Dziubinski); JX-190.

[60] JX-205; JX-207.

[61] *See* JX-171 at 2.

AMI added these dates to the forms when placing the orders.[62] After receiving these orders, AMI reminded Medicalgorithmics that the 2011 SAA only covered the PocketECG II, and that AMI needed to sign the amendment adding Attachment 4 to the 2011 SAA. As discussed above, that amendment, which AMI had received in July but still had not signed, covered the PocketECG III and its pricing.[63] Internally, Medicalgorithmics expressed concern about being unable to fill the large order AMI had placed within the timeframes it had requested.[64]

At the end of November 2013, after much back-and-forth discussion, AMI and Medicalgorithmics executed the amendment to the 2011 SAA incorporating the PocketECG III as a product under the 2011 SAA.[65] The amendment included Attachment 4, which provided for a prepayment fee of $505 per PocketECG III device, the same price circulated in the draft from July.[66]

On December 3, 2013, AMI asked Medicalgorithmics for an anticipated delivery schedule for the 4,000 units, acknowledging that the dates "may not be

---

[62] *See* JX-910 at 2.

[63] JX-205 at 1; *supra* note 50.

[64] JX-210.

[65] JX-223.

[66] *Id.*

15

exact."[67]  The next day, AMI informed Medicalgorithmics that the original purchase order forms for the 4,000 PocketECG III devices had been mailed.[68]  On December 9, Medicalgorithmics provided a tentative delivery schedule to AMI that was significantly behind the timeline AMI had requested in its order forms:  a total of 245 units out of the 1,000 requested by April, a total of 545 out of total 2,000 requested by May, 945 out of 3,000 by June, and 1,645 out of 4,000 by July.[69]  Medicalgorithmics estimated it would not reach the 4,000 unit mark until November 2014.  AMI expressed disappointment with this timeline, noting that it could not effectively market the PocketECG III until there were enough units to provide them to a critical mass of customers, and it considered whether the launch should be delayed until production could meet AMI's expectations.[70]  Neither company otherwise questioned whether the order should be withdrawn or rejected, or whether the delivery timeframe was unacceptable, or merely suboptimal.

Because it has the smartphone technology built into the device, the PocketECG III unit needs to be built to work on one of the two major cellular network types in the United States, namely CDMA or GSM.  Different wireless

---

[67] JX-225.

[68] *Id.*

[69] JX-226.

[70] *Id.*

carriers use different networks: CDMA is used primarily by Sprint and Verizon, while GSM is used mostly by T-Mobile and AT&T.[71] AMI asserts that it needed both types of the device because some of its patients had access to one network but not the other, although Medicalgorithmics contends this percentage is small.[72] It also was preferable for AMI to have access to CDMA PocketECG III devices because the vast majority of its patients using the PocketECG II already were on the Verizon (CDMA) network, and AMI had a strong business relationship with Verizon.[73]

AMI's order for 4,000 PocketECG III devices did not specify whether those devices should be designed for use on the GSM or the CDMA networks. Attachment 4 to the 2011 SAA did not specify which network the devices would use either. On December 9, 2013, in the same e-mail describing the production timeline for the PocketECG III, Medicalgorithmics asked AMI to estimate the percentage of GSM and CDMA devices they would need.[74] Medicalgorithmics indicated that it would need to begin with the GSM units, and only later could begin producing CDMA units, which it had not yet developed. The CDMA units

---

[71] Tr. 1102 (Velez).

[72] Tr. 1102 (Velez); Tr. 69-70 (Dziubinski).

[73] Tr. 496-98 (Joe).

[74] JX-226.

had the longest lead time for components, requiring them to place orders as soon as possible.[75]  AMI requested 2,000 of each.[76]  Although Medicalgorithmics noted the longer timeline for beginning production of CDMA units, it did not tell AMI that the order was unacceptable or that filling it would not be possible.

Around mid-December 2013, AMI placed additional orders for a total of 4,360 PocketECG II devices.[77]  Medicalgorithmics did not require AMI to prepay for these devices.[78]  AMI placed this order to "last us until we can transition fully to [PocketECG III]."[79]  Medicalgorithmics projected that the order would be filled over the next few months, and it was filled by about June 2014.[80]

### F.    The 2014 SAA

Joe and Andy's separation agreement became effective at the end of December 2013.  On January 2, 2014, Medicalgorithmics and AMI signed a new strategic alliance agreement (as defined above, the "2014 SAA") replacing the

---

[75] *Id.*

[76] Tr. 86 (Dziubinski); JX-482.

[77] JX-232.

[78] Tr. 692 (Joe).

[79] JX-251 at 3.

[80] *See id.* at 5; JX-328 at 4.  AMI does not contend that a breach of the SAA occurred in connection with the December 2013 order for PocketECG II devices.  Tr. Post-Trial Arg. 52.

2011 SAA. The 2014 SAA updated the 2011 SAA to account for the fact that Andy's part of the business, Medi-Lynx, was now a co-exclusive licensee.[81] The attachments from the 2011 SAA were included in the 2014 SAA, including the product description and fee schedule for the PocketECG II, but Attachment 4 from the amendment to the 2011 SAA signed in November, which described the PocketECG III device and fees, was not included.[82] The omission of Attachment 4 from the 2014 SAA was not intended to alter the previously agreed-upon pricing for the PocketECG III. To the contrary, both sides understood and expected that the pricing for that device would remain the same under the 2014 SAA as it was under the 2011 SAA.[83]

Medicalgorithmics did not fill the PocketECG III orders within the timeframe it envisioned. It sent the first 50 units at the end of April 2014, and 100 more in late June 2014, for a total of 150 devices rather than the 945 it had

---

[81] 2014 SAA at 1.

[82] *Id.* at 18-20.

[83] *See* Tr. 101-03 (Dziubinski) (explaining that they learned AMI had not signed an Attachment 4 for the 2014 SAA after a pricing dispute discussed below); Tr. 726-31 (Joe) (opining that the parties expected Medicalgorithmics would send a new Attachment 4 amending the 2014 SAA); *see also* JX-234 (e-mail from AMI's counsel informing Medicalgorithmics that, after entering into the 2014 SAA, for convenience Medicalgorithmics could "send new amendments in identical form as before for the new devices"); Tr. 103 (Dziubinski) (noting that Medi-Lynx promptly signed a new Attachment 4 upon learning that it had not been included in the Medi-Lynx 2014 SAA); Dziubinski Dep. 298-300 (opining that not signing amendment including Attachment 4 in the 2014 SAA was an inadvertent mistake).

19

expected to deliver by the end of June.[84] In September 2014, AMI sent Medicalgorithmics an e-mail expressing concern over the behind-schedule production of PocketECG III devices, pointing out that Medicalgorithmics was in violation of the delivery requirements of Section 10 of the SAA, while expressing confidence that Medicalgorithmics would be able to address the issues.[85] By mid-October 2014, Medicalgorithmics had sent all 2,000 GSM devices,[86] but it still had not completed development of the CDMA version.

On November 7, AMI sent Medicalgorithmics another letter, this time informing Medicalgorithmics that it was in material breach of the SAA due to alleged warranty issues, inventory deficiencies, and Medicalgorithmics' intent to phase out the PocketECG II. The letter requested that Medicalgorithmics cure the alleged breaches within 30 days and noted that the failure to do so could result in consequences "including and up to immediate termination."[87] According to Joe, AMI never intended to terminate the agreement but instead sent this notice to

---

[84] The monthly totals of Medicalgorithmics' shipments to AMI from April 2014 to April 2015 are summarized in an exhibit (JX-823) prepared from a database Medicalgorithmics operated in the ordinary course of its business. Tr. 776-77 (Zolkiewicz). AMI did not challenge the data in this exhibit, which I find to be reliable.

[85] JX-372.

[86] JX-823.

[87] JX-416.

encourage Medicalgorithmics to comply with the SAA.[88]   Medicalgorithmics responded to AMI's letter, disputing the alleged breaches and noting that AMI had been late on a number of payments under the SAA.[89]

### G.    AMI's Discussions with Vasomedical

Unbeknownst to Medicalgorithmics, AMI began exploring alternative technologies to the PocketECG even as it entered the 2014 SAA.

In August 2013, Juan Velez, the Chief Operations Officer of AMI,[90] had a phone call and exchanged e-mails with David Nierle, a sales representative for Vasomedical, Inc., a medical device manufacturer.[91]   Nierle provided Velez information regarding Vasomedical's products, including its combined ECG Holter and ambulatory blood pressure monitor.[92]   Over the following months, Velez and Nierle corresponded by e-mail a few times.   On October 15, Nierle inquired about AMI's potential interest in Vasomedical's Holter and ambulatory blood pressure

---

[88] Tr. 523 (Joe).

[89] JX-421.

[90] Tr. 1092 (Velez).

[91] Tr. 1161-62 (Velez); JX-186; Tr. 339 (Moss).

[92] JX-186 at 5.   For simplicity, I refer to both Vasomedical and its manufacturing subsidiary, Biox, as Vasomedical.  Certain quoted e-mails that mention Biox are referring to this subsidiary.

21

monitors.[93] On October 24, Velez informed Nierle that AMI was "very interested" but was still working out the details for the possible addition of a Vasomedical product.[94] On December 17, Velez told Nierle that he wished to focus on a "possible joint venture" between the companies starting in early January, after AMI had finished urgent company business, apparently referring to the split of AMI and Medi-Lynx that was underway.[95]

On January 2, 2014, the effective date of the 2014 SAA, Velez met with Nierle and Kelly Rodriguez, a consultant for Vasomedical.[96] Rodriguez summarized the details of their meeting in an e-mail she sent later that day to Jun Ma, the President and CEO of Vasomedical. Rodriguez described AMI's business with the PocketECG and explained that AMI was "interested in a win-win relationship whereas we can work together to develop future products they have identified with a focus on the USA and their new market India."[97] On January 6,

---

[93] JX-233.

[94] *Id.* at 2.

[95] *Id.* at 1.

[96] JX-250; Tr. 1163-65 (Velez).

[97] JX-250.

Nierle further explained to Ma that AMI was interested in, among other things, having Vasomedical "design/build a combo Event, Holter, MCOT device."[98]

Vasomedical and AMI met several more times over the following months, with Joe becoming more involved in the dialogue over time. On or about February 5, 2014, Joe, Ma, Velez, Rodriguez, and Nierle had a teleconference during which Ma gave a presentation called "Original Equipment Development and Manufacturing for Spectocor," copies of which were distributed to Joe and Velez.[99] On February 10, Rodriguez provided a summary of the companies' discussions to Velez, noting that, per the discussion, AMI would "explore the contractual terms of [its] existing OEM [Original Equipment Manufacturing] agreement, expiration dates, etc. and determine what OEM opportunities may exist within US and outside

---

[98] JX-253. "MCOT" means "Mobile Cardiac Outpatient Telemetry." *See* http://www.fcminc.com/Mobile-Cardiac-Outpatient-Telemetry.html (defining MCOT). Christian Taconet, a former employee of AMI, testified in deposition that Joe had discussed his frustrations with the PocketECG and his interest in AMI developing its own cardiac monitoring device in January 2014, although his testimony is unclear as to whether Joe hoped to develop his own device for use domestically or abroad. Taconet Dep. 29-34. AMI challenges Taconet's credibility because he had expressed dissatisfaction with working at AMI and reached out to Dziubinski in search of a job. Tr. 281-82 (Dziubinski); Taconet Dep. 113. Because Taconet did not testify at trial and I did not have the opportunity to observe his testimony, I reach no conclusion concerning his credibility and place no independent weight on his testimony, except to note that it corroborates my finding that AMI was seeking to develop a replacement for the PocketECG in early 2014.

[99] JX-272.

23

of US."[100]  Depending on the outcome of that inquiry, the companies might "pursue the opportunity for a custom design build of a special product to meet Spectocor's specifications."[101]  Both companies were to look for "other opportunities for partnership" both inside and outside the United States.[102] Commenting on Rodriguez's summary, Velez noted that AMI "would be more interested in a custom build in which we have sole rights to distribute using our model."[103]  In a March 2014 presentation, Vasomedical touted its ability "to complement and supplement Spectocor's current offering" and to use its talents "for the development of future proprietary products."[104]

On March 10, 2014 Ma, Rodriguez, and Nierle visited AMI's office in Texas, meeting Velez and Joe.[105]  Rodriguez prepared a summary of the meeting for Ma the next day, which indicated that AMI had issues with the PocketECG, including late product deliveries, and that there were ways Vasomedical "could develop products that would [be] viable options to move from their existing

---

[100] JX-273.

[101] *Id.*

[102] *Id.*

[103] JX-279 at 2.

[104] JX-282 at 23.

[105] Tr. 636-37 (Joe); Rodriguez Dep. 42; Ma Dep. 51.

relationship."[106]  According to the summary, which I credit, Joe demonstrated the "features and functionality" of the PocketECG to Vasomedical during the meeting.[107]  Ma's deposition testimony is consistent with Rodriguez's summary. He testified that "it is always [Vasomedical's] belief to combine everything [into] one" device, that Joe said at the meeting that Medicalgorithmics was having problems getting AMI the products it needed on time, and that the companies explored during the meeting the possibility of Vasomedical supplying a new device for AMI.[108]

At the end of March 2014, Rodriguez and Joe had another meeting. Rodriguez sent notes on the meeting to Ma on March 27, which indicated that AMI was seeking to "work towards a way out of [its Medicalgorithmics] relationship permanently," and that AMI was ready to work toward the development of a new product, which would not pose a legal problem for AMI as long as the product was different from the current one.[109]  According to the notes, Joe stated that

---

[106] JX-288 at 1.

[107] *Id.*  Although Joe denied doing this, Tr. 545 (Joe), I do not credit this testimony given the specific and contemporaneous nature of Rodriguez's notes summarizing the meeting between representatives of Vasomedical and Joe that occurred in Texas the day before, given Ma's testimony that Joe performed a similar demonstration for him in China in April, Ma Dep. 184-85, and given Joe's overall lack of credibility.  *See infra* notes 252-61 and accompanying text.

[108] Ma Dep. 51-55.

[109] JX-296.

Vasomedical's current products probably would not meet AMI's immediate needs, and that he wanted to visit Vasomedical in China during 2014 but was not prepared to do so yet.[110]

On April 1, Nierle, Rodriguez, Joe, and Velez met again. According to Rodriguez's notes to Ma regarding this meeting, AMI was frustrated with a software update from Medicalgorithmics that had caused major issues for AMI's monitoring systems, making Joe "now more determined to move away from Medicalgorithmics and have his own product without restrictions" and prompting him to reconsider making a trip to China in the near future to discuss products with Vasomedical.[111]

On April 3, AMI and Vasomedical entered into a mutual non-disclosure agreement.[112] On April 8, Velez e-mailed Nierle and Rodriguez to inquire about the cost of having Vasomedical develop a product for AMI based on the technology Vasomedical already had in place.[113] In mid-April, Joe visited Vasomedical in China, where Ma gave him a tour of the facilities.[114] Ma testified

---

[110] *Id.*

[111] JX-299.

[112] JX-300.

[113] JX-307 at 3.

[114] Tr. 644 (Joe); Ma Dep. 121-22.

credibly with specific details regarding how Joe demonstrated to him the functionality of the PocketECG software platform during that visit.[115]

On May 13, Nierle provided a summary of AMI's position to a number of other Vasomedical employees, including Ma:

> Joe Bogdan, President recently took a trip to China for the CMES meeting followed by a trip to Biox [Vasomedical's manufacturing subsidiary], hosted by Jun and Qiuming, for discussions on multiple topics. The visit was successful and Joe was impressed with the infrastructure in China and his visit to Biox. Their first priority is establishment of a Service Provider office on the other side of the globe to ensure better 24/7 coverage for their customers. ***Second priority is a 3 in 1 Monitoring unit to provide an alternate source for their present product.*** EECP© as a service provider or Finder's Fee arrangement is also a possibility but lower priority based on their high volume of work and their recent restructuring.[116]

At trial, Joe did not dispute that he told Ma that one of his priorities was to develop a 3-in-1 product, but claimed that he told Ma this product would be for international use in India or China.[117] Joe also testified that part of his trip to China was to investigate MobiCare, a telehealth platform developed by Vasomedical.[118] Joe opined that MobiCare would not be a replacement for the

---

[115] Ma Dep. 184-85.

[116] JX-311 (emphasis added).

[117] Tr. 646-47 (Joe).

[118] Tr. 564 (Joe).

PocketECG device because telemedicine platforms do not perform analytics but simply capture information about a patient's vital signs.[119]

On June 18, 2014, Rodriguez wrote an e-mail describing a meeting with Joe that day in which she noted that Joe planned to meet Ma in New York and expected Vasomedical to prepare a "draft agreement to review for the collaboration of the development of a product to meet state of the art needs for a 3/1 cardiac monitor (holter/telemetry/event) with bluetooth capability to capture every beat and transmit with no loss compression" and to include, among other things, a "joint venture agreement on the IP - Vasomedical and Spectracor [sic] to partner for opportunities to take worldwide."[120] Soon after, Ma and Joe met in New York, during which they "decided to move towards some type of agreement" regarding development of a cardiac monitoring device.[121] On July 11, Ma reconfirmed this agreement in an e-mail to Joe: "I am glad that we both decided to move ahead, and quickly."[122] Ma also asked Joe for a sample of their current PocketECG device so that they could get familiarized with its operations.[123]

---

[119] Tr. 564-65 (Joe). Joe's opinion aligns with that of Moss, who noted that MobiCare would not be a replacement for the PocketECG. Tr. 414-15, 435-36 (Moss).

[120] JX-332.

[121] Tr. 647 (Joe).

[122] JX-342.

[123] *Id.*

On July 28, Joe sent Ma an email in which he described AMI's interest in developing or acquiring products and a potential merger with Vasomedical:

Our interests is [sic] to either build or acquire our own technologies (hardware and software) that further the progress of our presence in the US market with the ability to move into the international arena in the near future. As we have discussed, Spectocor and Vasomedical/Biox have unique and complementary strengths. While an agreement to acquire technologies is attractive, even more so would be a means to join forces as one company. This could lead to a potential offer to purchase Vasomedical/Biox. Can we open a dialogue about this now and potentially develop a Memorandum of Understanding (MOU) that may be inclusive of product development and acquisition?[124]

In a responsive e-mail, Ma answered a question from Joe asking about what projects Vasomedical had in development that would be helpful to AMI: "We have started to develop a combination device for Holter, event monitor and MCT, with options to wirelessly connect BP, temp, SpO2, etc."[125]

On August 18, Joe followed up this e-mail exchange by sending Ma a first draft of a nonbinding letter of intent "to begin discussing terms for the formation of two joint venture entities for the creation of a stand alone service center to support international operations in East Asia, more specifically China, and the development of a stand alone state-of-the-art ***three-in-one mobile telemetry device***

---

[124] JX-350 at 2.

[125] *Id.*

29

. . . ."[126]  Both of the entities referenced in the letter of intent would have their principal places of business in the United States.[127]  The letter of intent called for the eventual transfer of the entity producing the 3-in-1 device to AMI:

> Spectocor would be awarded the entity owning the stand-alone state-of-the-art mobile telemetry device with the exclusive rights to the tolls and efforts of that entity. Spectocor would agree as a part of the agreement to not sell or use the device in the Chinese market in exchange for the transfer.[128]

This arrangement would give AMI ownership of a 3-in-1 device and exclusive rights to sell it worldwide, excluding China, and would help Joe achieve his goal of having AMI control its own product.

In late August and early September, Joe and Ma continued developing their ideas for a joint venture.  Ma sent Joe an outline of the scope of the joint venture's business, to which Joe added comments that are reflected below in bold text.  The entire outline, including Joe's comments, states as follows:

1. JV scope of business:

1a.
Multi-function MCT Device and Service Platform

- JV to subcontract **product/software** development work to VASO **with specific delivery tables, budgets, and regular progress reporting.**

---

[126] JX-360 at 1 (emphasis added); JX 362; Tr. 651-52 (Joe).

[127] JX-360 § 3.

[128] *Id.* § 6.

- **JV to subcontract development of Service Center to Spectocor with specific delivery tables, budgets, and regular progress reporting.**
- JV will own all IP's and rights (except for China **where VASO owns all and for USA where Spectocor owns all**)
- JV will pay VASO for the work later (to minimize initial capital contribution)

1b.
MCT Monitoring Service

- JV has exclusive rights worldwide (except for the US **where Spectocor owns those rights and for China where VASO owns those rights**)
- JV will pay Spectocor **later** for its consultation in starting up new services **(to minimize initial capital contribution)**

1c.
Exclusions

- VASO owns device rights in China
- **Spectocor owns device rights in the USA**
- **VASO owns MCT service rights in the China** [sic]
- Spectocor owns MCT service rights in the US
- Spectocor may contract VASO or JV for expanded monitoring support to the US business

2. Matters to consider for the JV

- Ownership and control
- Capitalization
- Jurisdiction **(Delaware)**
- Management **(50/50 with impasse rules)**[129]

An MCT device is a "mobile cardiac telemetry" device.[130] Joe initially suggested

at trial that the device referred to in the joint venture outline would only have

---

[129] JX-368.

[130] Tr. 317 (Moss).

mobile telemetry device functionality and not be a 3-in-1 device, but he later seemed to concede it would have all the functionality of a 3-in-1 device when pressed by the Court's questions.[131] Any suggestion that the joint venture outline was not referring to a 3-in-1 device is not credible. The letter of intent Joe sent Ma just a few weeks earlier specifically used the term "three-in-one,"[132] and the joint venture outline specifically refers to a "*multifunction* MCT device." Thus, the plain intention of AMI's proposed joint venture with Vasomedical was to make a 3-in-1 device that would include MCT as well as Holter and event monitoring.[133]

AMI and Vasomedical's discussions regarding their joint venture went quiet after these exchanges in August and September, and the companies never reached a formal agreement to develop a product.[134] But around the time that AMI's discussions with Vasomedical seemed to end, AMI began discussions with another potential product developer.

---

[131] Tr. 550-52 (Joe).

[132] JX-360 at 1.

[133] This finding also is supported by Medicalgorithmics' expert, who opined that a "multi-function MCT device" means a 3-in-1 Holter, event, and mobile telemetry device. Tr. 341 (Moss).

[134] Tr. 737 (Joe).

### H. AMI Works on Product Development with Professor Tamil

In September 2014, Joe began discussions with Lakshman Tamil, a professor of electrical engineering at the University of Texas, Dallas.[135] Tamil previously had developed a telemedicine system that could relay patient data from various biosensors to a data center.[136]

In November 2014, Joe attended a "Financial Sponsors Conference" hosted by Deloitte Corporate Finance where lenders and venture capitalists met with companies to explore investment opportunities.[137] According to notes from a Deloitte representative at that conference, AMI was "looking into buying a software platform developed by a group of [University of Texas] professors. . . . It could work with off the shelf hardware and would replace the company's licensed technology, eliminating a major cost."[138] Joe denied that this statement concerned the PocketECG, and offered inconsistent explanations about what he believed the notes meant: at first, he thought they referred to saving on licensing costs if AMI

---

[135] Tr. 994, 1029 (Tamil).

[136] Tr. 997, 1034-35 (Tamil); JX-333 (white paper entitled "Intelligent Telemedicine and Chronic Disease Care").

[137] Tr. 584-85, 677 (Joe).

[138] JX-432; Tr. 679 (Joe).

expanded to international markets; later he claimed they concerned Tamil's telemedicine platform, which would not replace the PocketECG.[139]

In mid-December, Tamil created two companies: Htel, LLC and imedLogix, LLC. Tamil and a colleague formed imedLogix to perform technology development work on a contract basis.[140] Htel was created to hold Tamil's telemedicine assets, which he carved out from other assets developed by his laboratory, the Quality of Life Technology laboratory, because AMI was only interested in the telemedicine technologies.[141] On January 15, 2015, AMI bought a 66.5% stake in Htel for $300,000, with Tamil and his colleagues retaining the minority interest.[142]

Around the same time, AMI and imedLogix began to negotiate a product development agreement. It is undisputed that an agreement was signed on April 15, 2015,[143] but the timing and nature of the negotiations leading up to that point is not clear because the record is missing information one would expect to see when parties negotiate a commercial agreement, such as drafts of the agreement and

---

[139] Tr. 586, 680, 741-42 (Joe).

[140] Tr. 1009 (Tamil).

[141] Tr. 998-99 (Tamil).

[142] JX-476; Tr. 999 (Tamil); Tr. 1034 (Tamil).

[143] JX-590.

communications reflecting the negotiations. Other than the executed version of the agreement, the only other version in the record is a draft dated January 15, 2015,[144] which Joe contends is an incorrect date that was carried over from the Htel agreement. According to the document's metadata, this draft was created on February 7 at the latest.[145]

The stated purpose of the agreement was "to describe terms under which the Parties will engage in a Product Development Agreement to support Buyer's expansion into international markets."[146] The product to be created was intended to meet or exceed AMI's "current device":

> Developer [imedLogix] will develop, formulate, design, and deliver to Spectocor a new state-of-the-art telemetry cardiac monitoring software platform (the "Product") that meets or exceeds Spectocor's current device to support Spectocor's expansion and growth in global markets in the future. Spectocor will own all developed software and intellectual property rights to the Product.[147]

Under the agreement, AMI would pay imedLogix $10 million if imedLogix developed a commercially viable product within one year, stepping down over increments to a payment of $8 million if imedLogix did so within 36 months, and

---

[144] JX-479 at 1.

[145] Tr. 1122-23.

[146] JX-590 at 2.

[147] *Id.*

no payment if creating the product were to take more than 36 months.[148] One required component for commercial viability under the agreement was receiving FDA approval.[149] AMI provided Tamil and his team space to work at Medicalgorithmics' office.[150]

On December 23, 2014, while AMI was pursuing a new venture with Tamil, Dziubinski sent Joe a lengthy "personal" email describing the history and status of the relationship between Medicalgorithmics and AMI, and stating that he wanted to touch base with Joe after the holidays to "talk broadly about the future of our collaboration."[151] Over a month later, on January 27, 2015, Joe sent Dziubinski an email acknowledging he had received Dziubinski's December 23 email, which included an out-of-the-blue question about the PocketECG III:

> I received your email dated 12/23/2013 [sic] and am thrilled you have achieved your life goals. ☺
> Question:
> Is PECG III an improvement of PECG II or is it a new stand-alone Product?[152]

---

[148] *Id.* § 5.

[149] *Id.*

[150] Tr. 666-67 (Joe).

[151] JX-510.

[152] JX-496.

Also on January 27, Velez, Joe, Rodriguez (who was no longer a Vasomedical consultant and was now working for AMI), and others were scheduled for a meeting that Joe described in the invitation's subject line as: "Urgent Meeting; RE: Strategy meeting vs Medicalgorithmics."[153] The record provides no other information about this meeting. Later in the day, after the scheduled time of the meeting, Velez e-mailed a Technical Support Coordinator at Medicalgorithmics the following request: "Please send me written specs on [PocketECG II]. I do not have anything in PDF format."[154] Velez provided no explanation in his message. When Medicalgorithmics asked Velez for more details about his request, Velez said that AMI had "the opportunity to get the largest military contact [sic] in military heart medicine and they are looking for specs on the devices."[155] AMI did not produce any documents relating to this alleged opportunity. Velez testified at trial that he could not recall who had contacted him about the opportunity or who the contractor was, and admitted he had never seen a request for a proposal.[156]

---

[153] JX-820.

[154] JX-501.

[155] *Id.*

[156] Tr. 1156-58 (Velez).

A calendar invitation reflects that Joe, Velez, and Joe Khan, AMI's Chief Information Officer,[157] were scheduled to meet the next day, on January 28, to discuss "R&D :: Software Development."[158] Velez testified that he does not remember whether he attended this meeting, which was scheduled for the morning after the previous strategy meeting and after he had requested technical specifications from Medicalgorithmics regarding the PocketECG II.[159] Joe acknowledged that the three of them were attendees at the meeting but did not remember the details of the meeting.[160]

On February 10, 2015, Joe purportedly drafted another e-mail replying to Dziubinski's December 23 e-mail in which Joe said he would like to meet him in Poland during a trip Joe planned to take to visit India "to initiate a new operations center there which will allow [AMI] to grow internationally with a new Telehealth technology we have just acquired."[161] Dziubinski never received this e-mail, and

---

[157] Khan Dep. 23; *see also* Tr. 946 (Mularczyk) (describing Khan as the manager of IT at AMI).

[158] JX-499.

[159] Tr. 1160-61 (Velez).

[160] Tr. 701-03 (Joe).

[161] JX-508.

Medicalgorithmics was unable to find it after checking its records through its third-party e-mail provider.[162] Joe admitted at trial that he never sent this e-mail.[163]

About three hours later on February 10, Joe drafted another reply to Dziubinski's December 23 e-mail, this time omitting any reference to a telehealth technology, international growth, or a trip to India, and stating instead simply that: "I agree that it would be a good time to meet and discuss our existing contract and future. I would like to visit you in Poland if possible. I have another trip being planned and can route my itinerary through Warsaw."[164] The next day, Dziubinski replied that he was available to meet Joe in Warsaw in March and asked to know the exact dates of Joe's trip.[165] Joe did not respond to this request.

AMI and imedLogix continued working on technology development together, but there is, once again, a dearth of evidence in the record that one would expect to exist regarding the specific work they were doing. One of the few documents during this period that does exist is a 95-page software requirements specification that imedLogix developed, dated April 11, 2015. Tamil testified that this document would have been a work in progress for perhaps a month before,

---

[162] Tr. 135-36 (Dziubinski).

[163] Tr. 588-89 (Joe).

[164] JX-510.

[165] JX-511; Tr. 124-25 (Dziubinski).

with AMI providing input regarding the specifications to include.[166] But no previous drafts of the specification document were produced.

Throughout the specification document are references to cardiac, event, and telemetry functions.[167] The introduction section of the document has a diagram of a telehealth system with additional features, including a glucometer and a blood pressure monitor.[168] But, according to John Moss, Medicalgorithmics' expert in product development, technical specifications, and mobile cardiac telemetry,[169] the technical aspects of the specification document focused specifically on Holter, event, and telemetry cardiac monitoring and did not cover any other functionality, aside from certain references to other vital signs that Moss opined were listed in the comments "as a future, not a must have now."[170] Moss also testified that

---

[166] JX-588; Tr. 1052-53 (Tamil).

[167] JX-588 § 3.8.3.2 ("Monitoring Session Type (eg: Event, Telemetry)"), § 3.8.3.3.3.1 (same), § 3.8.3.3.4 ("Telemetry and Event report generated for the current whole week."), § 3.8.3.4.2 (description of checkbox noting that "monitoring (i.e. Biosensor, Stress Test, Holter (if Biosensor is ECG), Event monitor, Mobile Telemetry) has been unrevealing"), § 3.8.3.4.5 ("When Event or Telemetry is selected an option for ordering a first 24hr monitoring is presented."),§ 3.8.5.3; Tr. 353 (Moss) (opining that language in § 3.8.3.4.2 refers to a Holter or mobile cardiac telemetry monitor).

[168] JX-588 § 1.1. The diagram of the telehealth system was not newly created for the specification document; instead, it appears to have been pulled from Tamil's white paper from June 2014 or earlier. *Compare* JX-588 § 1.1 *with* JX-333 at 2.

[169] Tr. 332-33 (Moss).

[170] Tr. 355-57 (Moss); *see* JX-588 § 3.2.1 (listing additional data channels for accelerometer, respiration, temperature, weight, oximeter, etc. as a "Should" level of desire, with comments specifying they are for a "Future version").

40

telemetry would not be relevant to other vital signs because it is designed for dynamic waveforms such as ECG, rather than static numbers such as a patient's glucose level.[171] Moss's opinion that the technical specifications laid out in the document focus on 3-in-1 cardiac monitoring is persuasive and matches my own review of the document.[172] The specification document also listed under the heading "General Constraints" that the device should be HIPAA compliant, FDA approvable, and compliant with Texas Health Authority regulations—all of which support an intention to use the device in the United States.[173]

## I. AMI and Medicalgorithmics Enter Litigation

By mid-March 2015, the relationship between AMI and Medicalgorithmics had deteriorated significantly. On March 10, Medicalgorithmics' auditor asked Velez to confirm AMI's outstanding balances with Medicalgorithmics. Joe replied to the e-mail chain two days later, stating that Medicalgorithmics may have overcharged AMI by $499,035 based on the price charged for PocketECG III devices, and by $514,215 based on potentially missing prepayments for new device

---

[171] Tr. 355-56 (Moss). In addition, according to Moss, "event" must refer to a cardiac event because, in contrast to a heart arrhythmia, other vital signs such as blood pressure or gaining weight are not emergent events or symptoms. Tr. 355 (Moss).

[172] Another imedLogix document associated with the project provides a table of various milestones relating to the project, which includes milestones focused on ECG-related requirements. JX-586.

[173] JX-588 § 2.3.

activations and for devices sent back for repair. Joe noted that AMI had not previously disclosed these invoice disputes to Medicalgorithmics.[174]

The alleged overpayment for PocketECG III devices was based on the difference between the $505 listed in the amendment adding Attachment 4 to the 2011 SAA for that device (plus interest), and the price of $303 originally included in the 2011 SAA for the PocketECG II device.[175] Contrary to the position Joe asserted to Medicalgorithmics' auditors, Joe admitted at trial that, when he signed the 2014 SAA, he expected the price of the PocketECG III would remain $505 ($513.83 including interest) under the 2014 SAA even though Attachment 4 had not formally been added to the new agreement.[176]

On March 13, Medicalgorithmics issued a late payment notice to AMI requesting payment of about $1.8 million.[177] On March 17, Joe e-mailed Dziubinski expressing dissatisfaction with the companies' relationship.[178] Reiterating the assertions he had made to Medicalgorithmics' auditors a few days

---

[174] JX-534.

[175] Attachment 4 to the amendment listed a price of $505 rather than $513.83. As discussed earlier, the difference of $8.83 reflects the accrued interest if AMI paid for the device 90 days after delivery, rather than prepaid for the device.

[176] Tr. 728 (Joe); *see supra* Part I.F (discussing omission of Attachment 4 from 2014 SAA).

[177] JX-538; JX-552.

[178] JX-547.

earlier, Joe told Dzuibinski in the e-mail that Medicalgorithmics had been overcharging AMI for new devices and asked to have a conference call with Dziubinski the next day, noting that if they could not speak to resolve these issues, AMI would need to "consider alternate measures to ensure our market future."[179] That call never occurred, although it appears Dziubinski attempted to contact Joe at the scheduled time on March 18 but was unable to reach him.[180]

On March 19, Dziubinski replied to Joe's e-mail, discussing the companies' degrading business relationship, requesting that they work together to improve it, and stating that he was open to meeting with Joe but that he rarely received a meaningful response from him despite the importance of their relationship.[181] Dziubinski also explained that AMI knew when it ordered the PocketECG III that the delivery timeframes for the new product were estimates, which was the reason Medicalgorithmics did not require prepayments.[182] Dziubinski further noted that Medicalgorithmics was open to working with AMI to resolve any billing errors,

---

[179] *Id.*

[180] JX-550; Tr. 130-31 (Dziubinski).

[181] JX-554.

[182] *Id.*

but that in light of the adverse relationship developments, Medicalgorithmics would begin sending late notices for overdue payments.[183]

On March 23, Dziubinski wrote to cancel a scheduled call with Joe until they could get their payment dispute sorted out, and requested that Joe provide an explanation of their invoice disputes in an e-mail instead.[184] Joe responded with an e-mail detailing a series of issues concerning their relationship. The final item stated that AMI was "seeking international growth opportunities, as we have discussed in the past with you, and I would like to determine if there are any opportunities to expand with Medicalgorithmics."[185]

This comment aroused immediate suspicion at Medicalgorithmics. Dziubinski credibly testified that he found it "extremely odd" that Joe would randomly ask about partnering for international expansion in the midst of a heated dispute over their commercial relationship.[186] After seeing Joe's message, Zolkiewicz and Dziubinski discussed the possibility that Joe was trying to fabricate a defense to a claim for breach of contract by claiming that he was only seeking a

---

[183] *Id.*

[184] JX-562.

[185] *Id.*

[186] Tr. 134 (Dziubinski).

new product for "international" purposes on the theory that the SAA only governed products for use in the United States.[187]

On March 23, AMI asked for 200 units of their CDMA order to be switched to GSM units. Medicalgorithmics confirmed the change and shipped these units on March 30.[188] On April 3, AMI asked to switch another 500 units from CDMA to GSM and inquired about the production timeline.[189] Medicalgorithmics initially agreed and estimated that they would ship in three weeks.[190]

Also on April 3, Joe e-mailed Dziubinski identifying "outstanding invoices for PECG III devices that need to be corrected," requesting invoices correcting for the difference between the billed amount of $513.83 per unit and the "contract amount" of $303 per unit.[191] Medicalgorithmics replied ten days later, disagreeing with Joe's assertions concerning the per-unit price, and demanding adequate assurance of AMI's performance before they would send any of the 500 GSM

---

[187] JX-563.

[188] JX-561; JX-572 at 2.

[189] *Id.*

[190] *Id.*

[191] JX-589.

devices AMI had recently requested to be shipped, given that AMI owed almost $2.3 million on outstanding invoices.[192]

On April 17, AMI sent a wire transfer paying its outstanding invoices along with a letter stating that the payment was made under protest and that AMI demanded an accounting.[193] AMI's letter also stated that Medicalgorithmics was in material breach of the 2014 SAA and demanded an immediate refund for the difference between the $303 per-unit price in the contract and the invoiced price of $513.83.[194] AMI noted that Attachment 1 of the 2014 SAA indicated that "[n]ew devices may also have other or additional functionalities" and that the definition of "Product" included "all IP associated with the Product, along with any variations, advancements, improvements, or modifications made to the Product during the term of this Agreement."[195] AMI cited a reply from Dziubinski to Joe's earlier question, in which Dziubinski stated that the PocketECG III was an improvement to the Product rather than a new Product. On that basis, AMI demanded that the original SAA terms, including the $303 price, be applied to the PocketECG III.[196]

---

[192] *Id.*

[193] JX-600 at 2.

[194] *Id.*

[195] *Id.* at 2-3.

[196] *Id.* at 3-4.

On April 23, Joe e-mailed Dziubinski to make a few points.[197] First, he noted the struggle with making device payments up front due to AMI's rapid growth and the fact that it takes time for AMI to be reimbursed for its services. Second, Joe asserted that AMI was in full compliance with the SAA and would continue to make payments on time "so there is no question Spectocor is in any way breaching the Agreement." Third, he noted that AMI was preparing legal action based on its discovery of inappropriate charges. Fourth, Joe stated that he was "hereby withdrawing all pending and unfulfilled device orders until further notice" and until Medicalgorithmics complied with the SAA and agreed to renegotiate certain terms. Fifth, he noted that Medicalgorithmics had breached the SAA multiple times and that its devices were not performing as required, pointing out a failure rate of over 30% for the PocketECG III. Finally, Joe noted that "Spectocor desires to shut down growth in the US market and begin concentrating on global expansion with other technologies. If you desire otherwise, please provide some good reasons for me to consider."[198]

On April 27, Medicalgorithmics sent AMI a notice of termination of the 2014 SAA under Section 7 of the agreement.[199] The notice stated that the

---

[197] JX-615.

[198] *Id.*

[199] JX-625.

termination was "effective immediately based on numerous material breaches" by AMI, including (1) AMI's efforts to seek or develop a replacement product in violation of Section 3.3, which Medicalgorithmics asserted "upon information and belief," and (2) AMI's withdrawal of its unfulfilled orders and stated desire to shut down the United States market, as reflected in Joe's April 23 e-mail. The notice also stated that Medicalgorithmics was terminating the agreement under Section 2-309 of the Uniform Commercial Code.[200] It filed this litigation on the same day.

On May 18, 2015, AMI sent its own notice of termination. The only specific breach the notice cited was AMI's "improper and invalid attempt to terminate the SAA on April 27, 2015."[201] AMI invoked the 24-month notice provision in Section 7(1) of the 2014 SAA, thus calling for the termination to be effective on May 18, 2017.[202]

## II. PROCEDURAL POSTURE

Medicalgorithmics filed this action on April 17, 2015. On May 1, 2015, the Court entered a stipulated *Status Quo* Order, which has governed the parties' relationship throughout this litigation.[203] Under the *Status Quo* Order,

---

[200] *Id.* at 2.

[201] JX-631.

[202] *Id.*

[203] *Status Quo* Order, May 1, 2015.

Medicalgorithmics has continued to provide services to AMI in accordance with the 2014 SAA, but Medicalgorithmics has not been obligated to fill any new equipment orders.[204] On May 18, 2015, AMI filed its answer and brought counterclaims against Medicalgorithmics.

On September 18, 2015, Medicalgorithmics filed its First Verified Amended Complaint, asserting seven claims for relief:

I. Declaratory Judgment that Medicalgorithmics Validly Terminated the SAAs;

II. Declaratory Judgment that Medicalgorithmics Validly Terminated the SAAs Pursuant to 6 *Del. C.* § 2-309;

III. Damages for Breaches of the SAAs, Breaches of the Implied Covenant of Good Faith and Fair Dealing Under Delaware Common Law and 6 *Del. C.* § 1-304 and Breaches of the Duty to Commercialize;

IV. Declaratory Judgment that AMI Is Not Entitled to a Refund of Any Alleged Overcharges Relating to Its Purchase of PocketECG III Devices;

V. Breach of Contract for Nonpayment of Late Charges on Delinquent Invoices;

VI. Injunctive Relief Regarding Defendants' Use of Substitute Batteries and Battery Chargers; and

VII. Injunctive Relief Regarding Plaintiff's Confidential Information.[205]

---

[204] *Status Quo* Order ¶ 2.

[205] Am. Compl. ¶¶ 49-114.

Counts VI and VII have been withdrawn.[206]  On October 8, 2015, AMI filed its Answer to First Amended Verified Complaint and Amended Verified Counterclaims, asserting four counterclaims:

I. Damages for Breach of the 2014 SAA;

II. Specific Performance for Breach of the 2014 SAA;

III. Damages and Specific Performance for Violations of the UCC; and

IV. Declaratory Judgment that Medicalgorithmics did not validly terminate the 2014 SAA and that it is still in force.[207]

Trial was held from March 7 to March 11, 2016.  Post-trial argument occurred on May 10, 2016.

## III.  LEGAL ANALYSIS

### A.  Legal Standard

Medicalgorithmics bears the burden of proving each element of each of its claims by a preponderance of the evidence.[208]  AMI bears the same burden for each of its counterclaims.  This burden requires proving "that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more

---

[206] PTO ¶ 27.

[207] Defs.' Ans. First Am. Verified Compl. and AMI Monitoring, Inc.'s Am. Verified Counterclaims ¶¶ 52-85.

[208] *See Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015), *appeal dismissed*, 130 A.3d 931 (Del. 2015).

likely true than not."[209]  This standard applies to the parties' claims for breach of contract as well as their requests for declaratory relief.[210]

I begin by assessing Spectocor's status as a defendant in this action.  I then turn to the questions of breach of contract, materiality of breach, damages, and declaratory relief.

## B.    Spectocor Is Bound by the 2014 SAA

In footnotes in their post-trial briefing, defendants argue that Spectocor cannot be held liable under the 2014 SAA because it, unlike AMI, did not sign the agreement.[211]  Spectocor originally raised this argument in June 2015 in a speaking motion for judgment on the pleadings.[212]  Medicalgorithmics filed a brief opposing that motion,[213] after which Spectocor failed to file a reply brief or to pursue the

---

[209]  *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at \*13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.).

[210] *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at \*4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010).

[211] Defs.' Op./Ans. Post-Trial Br. 40 n.33; Defs.' Reply Post-Trial Br. 3 n.3.

[212] Spectocor LLC's Mot. J. Pleadings, June 4, 2015.

[213] Pl.'s Br. in Opp'n to Spectocor LLC's Mot. J. Pleadings, June 17, 2015.

51

motion further. As such, I conclude that Spectocor has abandoned that motion and waived the argument.[214]

Even if Spectocor's unwarranted delay did not constitute a waiver, the argument is unavailing. The 2014 SAA was entered into "with the intent to create a separate Strategic Alliance Agreement for AMI Monitoring, Inc. and its Affiliates and Medi-Lynx Cardiac Monitoring, LLC, and its Affiliates."[215] The agreement includes "Affiliates" within its definition of "Parties" and defines the term "Affiliate" to include a "corporation or other entity controlled by, controlling, or under common control with Supplier or Buyer."[216] Joe, who signed the 2014 SAA on behalf of AMI,[217] controls both AMI and Spectocor.[218] Thus, Spectocor is

---

[214] *See* 60 C.J.S. *Motions and Orders* § 44 ("It is the responsibility of the movant to obtain, or request, a ruling from the court on a motion, and failure to do so constitutes a waiver of the motion. Generally, a motion which is not called to the attention of the court is presumed to have been waived or abandoned by the moving party."); *cf. Joyce ex rel. CTC Minerals, Inc. v. Cuccia*, 1997 WL 257448, at *2-3 (Del. Ch. May 14, 1997) (concluding that defendant had waived certain defenses that should have been argued earlier to avoid expense and prejudice to plaintiffs resulting from "piecemeal motions practice") ("[Defendant] was fully aware of his procedural defenses, yet chose not to present them, and instead subjected the plaintiffs to the delay and expense of litigating his motion to stay.").

[215] 2014 SAA at 1.

[216] *Id.*

[217] *Id.* at 17.

[218] Tr. 58 (Dziubinski) (noting that before the Bogdans' split, Joe and Andy were 50/50 owners of AMI and Spectocor); Tr. 684 (Joe) (noting that Joe gave Andy 50% ownership of Spectocor in about 2008). After the split in 2013, Andy gained ownership of Medi-

an "Affiliate" and was intended to be a party to the 2014 SAA. This reason alone suffices to bind Spectocor.

As this Court pointed out in *MicroStrategy Inc.*, an affiliate's lack of signatory status is "not a basis for [the affiliate] to escape liability . . . ."[219] In that case, the Court found that a wholly owned subsidiary of a signatory was bound by a contractual provision because the provision applied to "affiliates," which was defined to include any entity that a party "directly or indirectly, owns or controls."[220] Similarly here, although Spectocor did not sign the 2014 SAA, it is bound by its terms because the contract binds "Affiliates," which includes entities such as Spectocor that are "under common control" with AMI.

In addition, the record shows that AMI and Spectocor often were used interchangeably and that Spectocor held itself out as a party to the SAAs. For instance, it was Spectocor that sent Medicalgorithmics the November 2014 notice of breach of "***our*** Strategic Alliance Agreement."[221] Joe sent the notice on

---

Lynx in exchange for redeeming his interest in AMI and Spectocor, leaving Joe as the owner of those entities. *See* JX-246 ¶¶ 1.1-1.7; *see also* PTO ¶¶ 11-12 (naming Joe as President of AMI and sole Managing Partner of Spectocor).

[219] *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010) (applying contract to an affiliate entity formed after the contract was made).

[220] *See id.*

[221] JX-416 at 2 (emphasis added).

Spectocor letterhead using his title as Managing Partner of Spectocor.[222] Spectocor also acted as a party to the SAAs on numerous other occasions.[223] As a result, Spectocor accepted the benefits of the SAAs and the commercial relationship with Medicalgorithmics, and therefore must accept the obligations of the agreements as well.[224] For all of these reasons, I find that Spectocor was a party to the SAA and treat its actions and those of AMI as one and the same.

## C. Breach of the 2014 SAA

The 2014 SAA is governed by Delaware law.[225] Section 3.3 of the 2014 SAA, which is identical to the same section of the 2011 SAA, provides as follows:

> Without first providing notice of termination of this Agreement to Supplier [Medicalgorithmics], Buyer [AMI] agrees that it shall not seek, develop, engage, promote or market any technology to replace Supplier's products or services.[226]

---

[222] *Id.* at 5.

[223] *See* JX-600 (letter from Joe, as Managing Partner of Spectocor, on Spectocor letterhead, notifying of breach under the SAA and demanding an accounting); JX-554 at 2-3 (e-mail from Joe, signing as Managing Member of Spectocor, discussing business issues pertaining to the SAA).

[224] *See Westendorf v. Gateway 2000, Inc.*, 2000 WL 307369, at *4 (Del. Ch. Mar. 16, 2000) ("[O]ne who knowingly accepts the benefits intended as the consideration, coming to him or her under a contract voluntarily made by another in his or her behalf, becomes bound by reason of such acceptance to perform his or her part of the contract."), *aff'd*, 763 A.2d 92 (Del. 2000).

[225] 2014 SAA § 17.

[226] *Id.* § 3.3.

As explained below, I conclude that AMI breached Section 3.3 by no later than April 2014 by secretly seeking to develop a device for use in the United States to replace the PocketECG without first providing the required notice to Medicalgorithmics. Before discussing the factual basis for this conclusion, I address two contentions the parties raise concerning the meaning of Section 3.3.

First, AMI takes issue with what it means "to replace" Medicalgorithmics' products under Section 3.3. Specifically, AMI contends that, before providing a notice of termination, AMI only may not "market or take steps to market" a 3-in-1 device "in place of" the PocketECG, as if to suggest that a competitive product must exist before AMI can be found in breach of Section 3.3. Medicalgorithmics argues in response that AMI's interpretation would read the words "seek" and "develop" out of the contract. I agree with Medicalgorithmics.

In my view, the plain meaning of "seeking" or "developing" a replacement product does not require that a replacement product must be ready for use for a breach of Section 3.3 to occur. Rather, AMI will have breached the agreement if it was simply seeking to develop a replacement technology for the PocketECG without giving notice of termination to Medicalgorithmics.[227] In other words, the

---

[227] Indeed, Joe admitted at trial when discussing AMI's product development agreement with imedLogix that development of a product (albeit one intended for use in the United States) would violate the agreement. Tr. 575 (Joe) ("And if we were to do something of this nature and intend to use it in the United States, I believe that would have been a breach of our contract.").

expansive language of Section 3.3 does not require a landmark to occur, such as the successful creation of a replacement product or the sale of such a replacement, but is designed instead to ensure that "there can be no running start" for AMI to begin work on a replacement for the PocketECG.[228]

Second, Medicalgorithmics contends that the plain language of Section 3.3 covers the replacement of its products or services anywhere in the world, and not just in the United States. It points to Section 3.4 of the 2014 SAA, a reciprocal provision to Section 3.3, in which Medicalgorithmics agrees not to replace AMI's services. That provision explicitly limits itself to the United States:

> Without first providing notice of termination of this Agreement to Buyer, Supplier agrees that it shall not seek, develop, engage, promote or market the Product in the United States to any other entity to replace Buyer's services for current or future versions of Product and related IP.[229]

Medicalgorithmics argues that the use of "in the United States" in Section 3.4 shows that the parties knew how to write a provision to cover only the United

---

[228] *See Revolution Retail*, 2015 WL 6611601, at *10-11 (noting the expansive meaning of a provision preventing defendant from "engag[ing] in the business of developing, marketing, or manufacturing [competitive] systems" and rejecting defendant's argument that it only prevents the actual sale of a system).

[229] 2014 SAA § 3.4.

States if the parties had wished to do so, and that the exclusion of this limitation in Section 3.3 means that Section 3.3 is not geographically limited.[230]

AMI counters that Section 3.3 only covers products in the United States because the companies' commercial arrangement was centered entirely in the United States.[231] The 2014 SAA does focus on the companies' relationship in the United States. For example, the 2014 SAA states that the United States is "the exclusive territory in which Buyer intends to provide services using Supplier's products"[232] and that "[Medicalgorithmics] hereby grants to Buyer [AMI] and Medi-Lynx Cardiac Monitoring, LLC the exclusive right to use, sell, market, distribute, and license . . . the Products for diagnostic services within the United States."[233] These provisions logically coincide with the fact that Medicalgorithmics sold its devices in other countries through different companies. Ultimately, I need not decide whether Section 3.3 applies to products used outside

---

[230] *See MicroStrategy Inc.*, 2010 WL 5550455, at *7 ("The use of different language in the two sections shows the parties knew how to cover patents beyond the Licensed Patents when that was their intent.").

[231] There is evidence that this was Medicalgorithmics' understanding of Section 3.3. In March 2015, just one month before it sent AMI a notice of termination, Dziubinski and Zolkiewicz expressed concern that Joe was attempting to disguise development of a product in the United States as an international endeavor to avoid breaching Section 3.3. *See* JX-563.

[232] 2014 SAA ¶ 4.

[233] *Id.* § 8.1.

of the United States because I find as a factual matter that AMI breached the provision even if it were construed to apply only to the United States. I turn next to that factual question.

The trial evidence amply demonstrates that AMI sought to develop a 3-in-1 device to replace the PocketECG in the United States through its interactions with Vasomedical, and later with imedLogix. Numerous contemporaneous documents described in greater detail in the narrative above detail AMI's efforts to do so with Vasomedical:

- On January 2, 2014, Nierle, Rodriguez and Velez met and discussed AMI's desire to "develop future products . . . with a focus on the USA and their new market India," and that AMI was interested in having Vasomedical "design/build a combo Event, Holter, MCOT device."[234]

- In February 2014, Joe and Ma joined Nierle, Rodriguez and Velez in another discussion, during which they discussed that AMI would explore its contract with Medicalgorithmics to "determine what OEM opportunities may exist within US and outside of US," and both companies would look for "other opportunities for partnership" inside and outside of the United States.[235] Velez indicated that AMI "would be more interested in a custom build in which we have sole rights to distribute using our model,"[236] indicating the company's desire to control its own product.

- On March 10, 2014, Joe demonstrated the functionalities of the PocketECG for Vasomedical. During the same meeting, AMI expressed its dissatisfaction with the PocketECG's issues and delivery schedule, and Vasomedical discussed with AMI "ways [Vasomedical] could develop

---

[234] JX-253.

[235] JX-273.

[236] JX-279 at 2.

products that would [be] viable options to move from [AMI's] existing relationship."[237]  Notes from later in March indicate that AMI expressed a desire to "work towards a way out of [its Medicalgorithmics] relationship permanently."[238]

- In April 2014, Joe visited Vasomedical's production facilities in China,[239] during which he demonstrated the functionality of the PocketECG software platform to Ma.  After the visit, Nierle summarized AMI's interests, which included as its second-highest priority "a 3 in 1 Monitoring unit to provide an alternate source for their present product."[240]

- In July 2014, Joe sent Ma an e-mail stating, "Our interests is [sic] to either build or acquire our own technologies (hardware and software) that further the progress of our presence in the US market with the ability to move into the international arena in the near future."[241]

- In August 2014, AMI sent Vasomedical a draft of a letter of intent "to begin discussing terms for the formation of two joint venture entities for the creation of a stand alone service center to support international operations in East Asia, more specifically China, and the development of a stand alone state-of-the-art three-in-one mobile telemetry device . . . ."[242]  The MOU noted that the entity producing the 3-in-1 device—a term unique to the United States market—would be awarded to AMI at the end of the venture, provided that AMI did not sell or use the device in China.[243]

- Annotations that Joe added to a subsequent outline of a proposed joint venture between AMI and Vasomedical's concerning a "Multi-function

---

[237] JX-288.

[238] JX-296.

[239] Tr. 644 (Joe).

[240] JX-311.

[241] JX-350.

[242] JX-360 § 3.

[243] *Id.* § 6.

MCT device" stated that AMI would own all rights in the United States, while Vasomedical would own all the rights in China.[244]

In terms of a timeframe for the breach, it would be reasonable to conclude from the record that AMI had begun to seek a new 3-in-1 device for use in the United States in place of the PocketECG as early as January 2014, when Velez first met with representatives of Vasomedical to discuss AMI's desire to develop a 3-in-1 device for use in the United States. But the conclusion that AMI was pursuing a replacement device for use in the United States is inescapable in my opinion when the respective heads of AMI (Joe) and Vasomedical (Ma) met in China in April 2014 to discuss developing "a 3 in 1 Monitoring unit to provide an alternate source for [AMI's] present product."[245] Thus, based on the totality of the evidence of record, I find that AMI breached Section 3.3 by no later than April 2014.

In the face of numerous contemporaneous documents evidencing the nature of AMI's interactions with Vasomedical, the only rebuttal AMI offers is Joe's testimony that AMI was seeking a product for use in India or China, rather than the United States,[246] and that the reason he sought exclusive rights for AMI to use the product in the United States was to have "blocking rights" to prevent Vasomedical

---

[244] JX-368.

[245] JX-311.

[246] Tr. 646-47 (Joe).

or the joint venture from competing with AMI's current license with Medicalgorithmics.[247] This testimony, which is uncorroborated by any documents or other evidence, is not credible.

To start, Joe's own revisions to the outline of joint venture terms indicate that AMI would control the replacement device in the United States and that Vasomedical would retain the rights in China.[248] It would be illogical for AMI to seek a product for its use in India and China while giving away rights to that product in China. More importantly, Joe's self-serving explanation about "blocking rights" defies reason. It makes no business sense that AMI would partner with Vasomedical to develop a 3-in-1 device for use in India (or elsewhere outside the United States) and not seek a return on its investment in the most lucrative healthcare market in the world—the United States—where all of AMI's experience had been gained to date and where, unlike other countries, all the functions provided by the 3-in-1 device are reimbursable.[249] Apart from being

---

[247] Tr. 553-54, 739 (Joe).

[248] JX-368; *supra* note 129 and accompanying text.

[249] Tr. 21-22 (Dziubinski) ("[T]he three-in-one, these three methods are reimbursable in the United States. There's no other country in the world where these three methods would be reimbursable. And therefore a physician from India or from Poland would not know what the three-in-one is. I don't know any other -- any company that would sell three-in-one devices outside of the United States. So this is a very U.S.-specific name."); *id.* ("Three-in-one device is very U.S.-specific name, because anywhere else in the world, mobile cardiac telemetry is unknown, or nearly completely unknown, method."); Tr. 376-77 (Moss) (opining that it would make no business sense to develop a 3-in-1 without

61

unsubstantiated by documents or other evidence, Joe's "blocking rights" assertion cannot be squared with substantial evidence of Joe's dissatisfaction with AMI's relationship with Medicalgorithmics and professed desire to find a replacement product that would allow him to control AMI's destiny and to sever its ties with Medicalgorithmics.[250]

AMI's efforts to develop a replacement product for the PocketECG in the United States are also evident from its dealings with imedLogix, which began at the tail end of AMI's discussions with Vasomedical. As described in greater detail above, Tamil was working on a product development agreement with AMI by February 2015. The agreement eventually reached called for a $10 million payment if imedLogix developed a commercially viable product within one year, which was contingent on obtaining FDA approval—a United States standard. The specifications for the product to be made called for a 3-in-1 device and are replete

---

the intent to commercialize it in the United States since it is a specification unique to the United States).

[250] *See* JX-288 (noting that Medicalgorithmics was having trouble delivering product on time, was unwilling to extend their relationship with AMI internationally, and PocketECG issues); JX-279 (noting that AMI "would be more interested in a custom build in which we have sole rights to distribute using our model"). Defendants suggest that Joe's interest in Vasomedical concerned its MobiCare product for bedside patient monitoring. Even if AMI also was interested in the MobiCare product, it is irrelevant because, as I have found, AMI was in discussions with Vasomedical to develop a 3-in-1 cardiac monitoring device to replace the PocketECG in the United States.

with other indications that the product was intended for use in the United States, such as compliance with HIPAA and Texas Health Authority regulations.[251]

In the midst of its interactions with imedLogix, moreover, Velez asked Medicalgorithmics for technical specifications on the PocketECG II, a highly unusual request that triggered suspicions at Medicalgorithmics. The request took place on the same afternoon that Joe, Velez, and others held a "Strategy meeting vs Medicalgorithmics." Velez's testimony that he needed the specifications for a large potential military contract, about which he could provide no names, details, or documents, is not credible. Rather, the logical inference, which I find, is that AMI's meetings with imedLogix, the product development agreement they entered into requiring FDA approval, the specifications for a 3-in-1 device ostensibly to be used in the United States, and AMI's request that Medicalgorithmics provide it with the technical specifications for the PocketECG, all reflect a continuation of the plan that began with Vasomedical to develop a new 3-in-1 device to replace the PocketECG in the United States.

Finally, a further reason I do not credit Joe's naked denial that his discussions with Vasomedical (and later with imedLogix) were in furtherance of a plan to replace the PocketECG in the United States is that Joe's credibility at trial was lacking in numerous other important respects. For example:

---

[251] *See supra* Part I.H.

- Joe told Medicalgorithmics' auditors (without warning Medicalgorithmics) that AMI had been systematically overcharged for PocketECG III devices.[252] But, as Joe admitted, he expected the price of the PocketECG III to be the higher amount of $505 rather than $303—as previously had been documented in Attachment 4 of the amendment to the 2011 SAA.[253] In other words, Joe had no good faith basis to claim that AMI had been overcharged for the PocketECG III devices. He manufactured a pricing dispute that not only created problems for Medicalgorithmics with its auditor, but also formed the basis of a meritless claim in this litigation.

- In an effort to deny that AMI was trying to develop a 3-in-1 device with Vasomedical, Joe offered a convoluted, nonsensical explanation of the meaning of a multi-function MCT device. Joe initially claimed that a "multi-function" MCT device did not need to have any functionality other than telemetry, before essentially admitting that it likely would have the other functions of a 3-in-1 device.[254]

- Joe drafted but did not send an e-mail explaining to Dziubinski that "a new Telehealth technology we have just acquired" was for the purpose of international expansion.[255] Shortly after, Joe drafted and sent a similar e-mail omitting any reference to international expansion.[256] Joe ultimately admitted he never sent the original e-mail, but offered a confusing explanation for why it was not sent.[257] AMI produced the unsent email in discovery and used it during Dziubinski's deposition.[258] During that deposition, Dziubinski explained that Medicalgorithmics had checked its servers and confirmed that the e-mail had never been received.[259] The e-

---

[252] JX-534.

[253] Tr. 728-32 (Joe); JX-223 at Attachment 4.

[254] Tr. 548-52 (Joe).

[255] JX-508.

[256] JX-510.

[257] *See* Tr. 588-90 (Joe).

[258] Dziubinski Dep. 568-71.

[259] Dziubinski Dep. 569.

mail appears to have been created in order to manufacture evidence that AMI's discussions with other manufacturers were above board and directed only to international markets when, in reality, they were not.

- Joe testified that the imedLogix agreement was created in April 2015.[260] This assertion was belied by evidence from Tamil's privilege log that the document existed as of February 7, 2015.[261]

\* \* \* \* \*

In sum, for the reasons explained above, it is clear from the record that, at least as of April 2014, when Joe went to China to meet with Ma, if not months earlier, AMI was working with Vasomedical to seek a replacement for the PocketECG for use in the United States. I thus find that AMI breached Section 3.3 of the 2014 SAA by no later than April 2014.

## D. Materiality of AMI's Breach

Section 7.2 of the 2014 SAA provides that, "upon the occurrence of a material breach of this Agreement, . . . the non-breaching Party shall be entitled to immediately terminate this Agreement at their discretion[.]" Thus, if AMI's breach of the 2014 SAA as of April 2014 was material, Medicalgorithmics was entitled to terminate the agreement under its own terms at that time. In that circumstance, AMI also would be entitled to terminate the 2014 SAA under Delaware law, which provides that:

---

[260] Tr. 740 (Joe).

[261] Tr. 1122-23.

65

"A party is excused from performance under a contract if the other party is in material breach thereof." . . . A "material breach" is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract. In other words, for a breach of contract to be material, it must "go to the root" or "essence" of the agreement between the parties, or be "one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[262]

"The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree . . . ."[263] Courts in Delaware look to Section 241 of the *Restatement (Second) of Contracts* for guidance regarding materiality of a breach.[264] That section lists the following circumstances as significant in determining materiality of a breach:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

---

[262] *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013).

[263] *Id.*

[264] *See, e.g.*, *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015); *BioLife Solutions., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[265]

Section 3.3 was designed to protect Medicalgorithmics by deterring AMI, its exclusive licensee in the United States, from seeking or developing a product that would compete with the PocketECG.[266] Dziubinski credibly testified that Medicalgorithmics was willing to accept the 24-month termination notice requirement, as opposed to an absolute ban on seeking competing technology, because it would not allow enough time to develop a competing technology.[267]

By breaching the 2014 SAA, AMI deprived Medicalgorithmics of the benefit it reasonably expected from this provision, namely that AMI would not be able to begin seeking or developing a replacement product without officially notifying Medicalgorithmics and putting a 24-month termination period in motion, which would allow Medicalgorithmics to begin making its own arrangements for its post-termination business. The mere fact that AMI did not succeed in bringing a finalized replacement product to fruition does not negate this injury, because the

---

[265] *Restatement (Second) of Contracts* § 241 (1981).

[266] *See* Tr. 33 (Dziubinski).

[267] Tr. 37 (Dziubinski) (explaining the time periods involved in creating algorithms, obtaining FDA approval, and testing a product).

broadly drafted provision was intended to protect Medicalgorithmics by preventing AMI from even *seeking* or *developing* a replacement. AMI's breach exposed Medicalgorithmics to these very risks and deprived it of a meaningful benefit of the contract.

Medicalgorithmics cannot be compensated adequately for the breach with damages, and thus termination is an appropriate remedy under the circumstances in my view. The breach was not a mere performance failure, but was a violation of an agreement not to seek or develop replacement technology as part of an exclusive licensing agreement.[268] By seeking to replace the PocketECG, AMI deprived Medicalgorithmics of a primary benefit of an exclusive licensing arrangement. Awarding damages to Medicalgorithmics while allowing the licensing arrangement—or even the *Status Quo* Order—to continue would not be adequate compensation, because the trust and exclusivity inherent in the 2014 SAA have been irretrievably tainted. Similarly, it is not possible for AMI to cure its breach, because it cannot undo the effects of its secret efforts to replace the PocketECG or restore the protection from the risk of development that Medicalgorithmics lost.

---

[268] AMI became a co-exclusive licensee instead of the sole licensee after the split between Joe and Andy. Although somewhat less significant than a solely exclusive arrangement, AMI remained only one of two providers of the PocketECG in the entire United States.

AMI will not suffer a forfeiture if the agreement is terminated. AMI's plan to develop a replacement product presumably would have resulted in the eventual termination of the agreement once it had completed development of a replacement. Had AMI submitted a notice of termination in January 2014, when it began meetings with Vasomedical, or even in April 2014, when Joe visited their facilities in China, the two-year termination period already would have expired, and AMI would no longer be able to rely on the agreement.

AMI argues that the costs of retraining staff for a new product and for the PocketECG devices it already has purchased, which will no longer be functional, amount to a forfeiture.[269] But AMI eventually would have faced similar costs if it had completed development of a replacement for the PocketECG or if it had submitted a termination notice after beginning discussions with Vasomedical. Even under the notice of termination that AMI sent with an effective date of May 2017,[270] AMI eventually would have incurred such costs. I therefore do not find that AMI would suffer a forfeiture upon termination of the 2014 SAA.

Finally, as discussed above, AMI was intentionally seeking and developing a replacement for the PocketECG for use in the United States. It did so in secret and without providing the required 24-month termination notice to Medicalgorithmics.

[269] Defs.' Op./Ans. Post-Trial Br. 64.

[270] JX-631.

This conduct does not meet the standards of good faith and fair dealing. To the contrary, AMI's covert plan to develop a replacement for the PocketECG that would sabotage Medicalgorithmics' distribution channels in the lucrative United States healthcare market was undertaken in bad faith to deprive Medicalgorithmics of a critical element of its bargain.

AMI's lack of good faith is further evidenced by the false allegations of overcharging it made to Medicalgorithmics' auditors without warning.[271] Joe admitted at trial that he expected the price of the PocketECG III to be $513.83 (the $505 base price plus interest), rather than the $303 he used in developing his allegations of overcharging, and that he disputed the pricing simply to get Dziubinski come to the table to renegotiate their contract.[272] Ambushing Medicalgorithmics by stirring up its auditor in order to gain leverage to renegotiate its pricing structure was another act of bad faith.

Based on my consideration of the *Restatement* factors and my conclusion that Medicalgorithmics was deprived of a meaningful benefit of the contract as a result of AMI's conduct in seeking a replacement product, I find that AMI's breach of the 2014 SAA in April 2014 was material, entitling Medicalgorithmics to

---

[271] *See supra* Part I.I.

[272] Tr. 728-32 (Joe).

terminate the agreement under its own terms and under Delaware contract law.[273] Consequently, Medicalgorithmics validly terminated the agreement in April 2015.

Because I conclude that Medicalgorithmics validly terminated the 2014 SAA based on AMI's material breach of Section 3.3, I need not address Medicalgorithmics' separate claims for termination, namely AMI's alleged repudiation, its alleged breach of the duty to commercialize the PocketECG, its alleged breach of the implied covenant of good faith and fair dealing, or Medicalgorithmics' right to terminate under Section 2-309 of the Uniform Commercial Code.[274]

### E. Medicalgorithmics Did Not Breach the Agreement Before AMI

AMI contends that Medicalgorithmics breached the 2014 SAA by failing to timely deliver PocketECG III devices, with a material breach "for purposes of this case" first occurring in August 2014, at which time Medicalgorithmics had delivered only 747 of the 1,000 PocketECG III devices AMI had ordered in April, 120 days earlier.[275] This claim is based on Section 10.1 of the 2014 SAA, which states that a failure to fulfill an order for any number of units within 120 days constitutes "a material breach of this Agreement subjecting the Agreement to

[273] *See supra* note 262.

[274] Tr. Post-Trial Arg. 28 (noting that these other claims are alternative grounds to reach the same end, namely a declaration that the termination was valid and damages).

[275] Tr. Post-Trial Arg. 45; Defs.' Op./Ans. Post-Trial Br. 18.

71

immediate termination at the discretion of Buyer."[276]  AMI argues that this breach excused any subsequent breach by AMI.

Medicalgorithmics disputes AMI's characterization of these delivery delays as material breaches, pointing out that the 120-day requirement assumed that device orders would be prepaid in accordance with Attachment 2 to the SAA.  It also argues that, by continuing to perform under the contract by ordering and accepting PocketECG devices, AMI waived any potential breach of this provision by Medicalgorithmics.  Both of these arguments have some persuasive force, but I need not decide them because AMI's breach occurred in April 2014 (if not earlier), thereby preceding the purported breach by Medicalgorithmics that AMI alleges occurred in August 2014.  Consequently, Medicalgorithmics committed no prior material breach that could have excused AMI's obligations under the 2014 SAA, including under Section 3.3.[277]

Because I conclude that AMI materially breached the 2014 SAA in April 2014 and that Medicalgorithmics did not breach the 2014 SAA before AMI did, I deny AMI's counterclaims for damages and specific performance for Medicalgorithmics' alleged breach of the 2014 SAA.  In addition, because I

---

[276] 2014 SAA § 10.1; *see also supra* note 37 and accompanying text.

[277] *See BioLife Solutions*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").

conclude that Medicalgorithmics validly terminated the 2014 SAA, I deny AMI's counterclaim for a declaratory judgment that the 2014 SAA is still in force. Finally, I deny AMI's request for a declaration that Medicalgorithmics violated the Uniform Commercial Code, which AMI did not press at trial or address in its briefing, thus waiving the claim.[278] Judgment will be granted in Medicalgorithmics' favor on all of AMI's counterclaims.

### F. Medicalgorithmics' Damages

Medicalgorithmics seeks damages in addition to termination of the 2014 SAA and of the *Status Quo* Order. "Plaintiffs must prove their damages by a preponderance of the evidence"[279] and "must prove their damages with a reasonable degree of precision and cannot recover damages that are merely speculative or conjectural."[280] On the other hand, "Delaware does not require certainty in the award of damages where a wrong has been proven and injury established. . . . Responsible estimates of damages that lack mathematical certainty

---

[278] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[279] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[280] *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (internal quotation marks omitted).

are permissible so long as the court has a basis to make such a responsible estimate."[281]

Medicalgorithmics did not offer any independent expert testimony to attest to its damages. It instead offered a simplistic calculation of expectation damages through its CEO (Dzuibinski) that was presented in a matter of minutes and comprises about four pages out of 1,306-page trial transcript.[282]

Dzuibinski estimated that AMI's breach caused Medicalgorithmics to lose annual sales of 6,657 PocketECG III devices and associated monthly service charges for a two-year period beginning in April 2015, when Medicalgorithmics provided its notice of termination. This sales estimate is based on a year-to-year growth rate of 100% for the first year, which was the average rate of sales growth over the past few years.[283] It also assumes that AMI would continue buying approximately 555 devices each month for the 24-month period leading up to a proper ending of the agreement.[284] Based on these assumptions, Medicalgorithmics contends it suffered $3,150,698 in damages in the first year, consisting of $1,531,110 in lost net revenues for device sales plus $1,619,588 in

---

[281] *Beard Research*, 8 A.3d at 613 (internal citations and quotation marks omitted).

[282] *See* Tr. 147-50 (Dziubinski).

[283] Tr. 147-48 (Dziubinski).

[284] JX-822.

lost net revenues for services.[285] Because the contract would not have expired for 24 months after a valid notice of termination, Medicalgorithmics argues it is appropriate to double this one-year figure, for a total of $6,301,696 in damages.[286]

AMI disputes both the evidentiary foundation for these figures and the logic behind them. It argues that the assumption of a continued 100% growth rate is unrealistic, and that it would not be reasonable to expect AMI to continue purchasing large volumes of devices close to the end of the two-year termination period because the devices would no longer be supported by Medicalgorithmics upon expiration of the contract and thus would become unusable.[287] AMI further argues it would not have continued purchasing such a high volume of PocketECG III devices because what it really wanted were CDMA devices, which were not available.

---

[285] *Id.*

[286] Pl.'s Op. Post-Trial Br. 63.

[287] Defs.' Op./Ans. Post-Trial Br. 64 ("[The PocketECG] devices will not work without access to [Medicalgorithmics'] services, so AMI will have purchased products that it cannot use . . . ."); 71-72 (arguing that AMI would have slowed purchases to "avoid being stuck with millions of dollars of unusable devices once the SAA terminated"); *see also* Tr. 1300 (AMI requesting completion of a 24-month termination period so that AMI would not have to "shut our doors"); 2014 SAA § 14.1 (noting that all rights to the licensed software belong to Medicalgorithmics except as provided in the agreement); JX-393 at 59-61 (manual explaining that PocketECG relies on client software).

I agree with AMI that Medicalgorithmics' damages estimate is based on unrealistic and speculative assumptions. Given the tension between the companies, including ongoing concerns AMI had expressed about Medicalgorithmics' production timelines and product quality, it is unlikely that AMI would have purchased 6,657 PocketECG III devices had the contract not been terminated.[288] Much to AMI's dismay, Medicalgorithmics had failed to promptly develop a marketable CDMA version of the PocketECG III. It also is unrealistic to assume that AMI would have continued to purchase large numbers of devices right up until the contract expired after the hypothetical two-year period used for estimating damages because the devices would cease to function at the end of the period. Moreover, although AMI's material breach of Section 3.3 undoubtedly caused certain unquantifiable injuries, Medicalgorithmics' decision to terminate the agreement could be said to have caused most of the alleged losses for which it seeks a recovery because it could have chosen not to terminate the agreement and to sue instead for injunctive relief to address AMI's violation of Section 3.3. For all these reasons, I reject Medicalgorithmics' estimate of damages as unrealistic and speculative.

---

[288] Putting aside the relationship and product issues that would have made large orders less likely, Medicalgorithmics' estimate of about 555 devices per month is aggressive compared to deliveries made shortly before the litigation. *Compare* JX-700 (showing deliveries of 800 devices in the first quarter of 2015, or 200 per month on average) *with* JX-822 (damages calculation estimating deliveries of 555 devices per month).

The Court may exercise its "own independent judgment in determining the calculation of damages."[289]  In my view, a realistic estimate of damages Medicalgorithmics suffered can be derived from the 1,000 devices that AMI ordered in November 2013 and later cancelled on April 23, 2015.[290]  These 1,000 devices are the balance that had not been filled from the order for 4,000 PocketECG III devices AMI placed in November 2013, consisting of 2,000 GSM and 2,000 CDMA devices.[291]  Although the unfilled balance was for CDMA devices that Medicalgorithmics was unable to provide, it is reasonably likely in my judgment that AMI would have accepted GSM devices for this remaining balance given that AMI previously switched the other half of its order for CDMA units (*i.e.*, 1,000 units) to GSM units during 2015 to meet its sales demand.[292]

In its damages analysis, Medicalgorithmics calculated its loss of net revenue for PocketECG III devices at $230 per unit, representing the difference between a

---

[289] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013).

[290] JX-615.

[291] JX-207.

[292] *See* JX-700; JX-561; JX-481; JX-495; JX-526; JX-530; Tr. 274 (Dziubinski).  It appears that if things had proceeded in the ordinary course, a greater proportion of this order would have been switched to GSM.  *See* JX-572 (requesting switch for 500 units, which would have brought the total switched to 1,300 out of 2,000, although order never appears to have been executed).

77

price of $505 and variable manufacturing costs of $275 per unit.[293] AMI argues that this calculation improperly fails to account for Medicalgorithmics' fixed costs, including R&D. It is not necessary, however, to add fixed costs to the per-device cost because Medicalgorithmics would have incurred those costs regardless of AMI's breach.[294] For similar reasons, I reject AMI's argument that Medicalgorithmics should use its net profit margin of 36.7%[295] rather than its calculation based on sale price and manufacturing costs. Accepting Medicalgorithmics' estimate of $230 per unit in lost net revenue, I calculate its damages from the lost sale of 1,000 devices to be $230,000.

It stands to reason that Medicalgorithmics also suffered damages for lost service fees for losing the opportunity to sell the estimated 1,000 devices. It would be speculative to award additional damages for those service fees, however, because the record is devoid of reliable evidence from which to extrapolate a reasonable estimate of the service fees one would expect to derive from devices sold under the circumstances discussed above, particularly given the uncertainty as to how long the devices would remain active. Although a plaintiff need not

---

[293] Tr. 252 (Dziubinski).

[294] *See All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *11 (Del. Ch. Aug. 9, 2004) ("[T]he Court will not charge fixed costs against Plaintiff's damages. The Court finds that [plaintiff's] expert properly did not deduct fixed costs in calculating lost profits."), *aff'd*, 880 A.2d 1047 (Del. 2005).

[295] Tr. 254 (Dziubinski).

calculate damages with certainty, "this Court will nonetheless refuse to award damages based on mere speculation or conjecture where a plaintiff fails to adequately prove damages."[296] In this case, Medicalgorithmics' estimated damages for lost service fees are speculative, and it has failed to adequately prove them.

AMI argues that Medicalgorithmics failed to mitigate its damages because it could have shipped more devices to AMI but it refused to do so without receiving adequate assurances of payment from AMI. This argument is unpersuasive for several reasons. First, Medicalgorithmics' request for adequate assurances was made in response to AMI's contention that the price for each device should have been $303 and not $505. As explained above, this request was a reasonable response to AMI's bad faith argument that it was being overcharged $202 per device. Second, although Medicalgorithmics did request adequate assurances, it was AMI that definitively withdrew its device orders before Medicalgorithmics terminated the 2014 SAA as a result of AMI's material breach. Third, even though it was not required to ship more devices under the *Status Quo* Order, Medicalgorithmics nevertheless shipped another 200 units in June 2015 upon

---

[296] *Encite LLC v. Soni*, 2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011) (quoting *Beard Research*, 8 A.3d at 613) (internal quotation marks omitted).

AMI's request,[297] thus reducing its damages from a base of 1,200 withdrawn devices to 1,000.[298] In sum, AMI has not demonstrated that Medicalgorithmics failed to mitigate its damages from the 1,000 devices that were never sold.

Finally, Medicalgorithmics contends that it is entitled to late payment charges based on Section 5.3 of the 2014 SAA, which states:

> Supplier may assess late payment charges on amounts not paid within thirty (30) days of the invoice date and written notice of non-payment delivered to Buyer at the maximum rate allowed by law or 1½% per month, whichever is less.[299]

When Medicalgorithmics sent late payment notices to AMI on March 18, 2015, it provided written notice of non-payment and that it was assessing late charges.[300] Dziubinski testified that these charges amounted to $23,482.08.[301] AMI has not disputed Medicalgorithmics' calculation of this amount, which apparently is based

---

[297] Tr. 1093 (Velez); Tr. 274 (Dziubinski).

[298] *See* JX-700 (noting 4,000 ordered devices and 3,000 delivered, including June 2015 delivery of 200 devices). Medicalgorithmics also sent another 250 devices at some point in 2015 that AMI returned because it had not requested them. Tr. 274 (Dziubinski).

[299] 2014 SAA § 5.3.

[300] JX-552 (noting assessment on each invoice) ("Medicalgorithmics S.A. reserves its right to assess and hereby does assess late payment charges on the invoiced amount not paid within thirty (30) days of invoice date at the maximum rate allowed by law or 1.5% per month, whichever is less.").

[301] Tr. 151 (Dziubinski); JX-800.

on the legal interest rate of 6%.[302] Thus, Medicalgorithmics is entitled to this amount in addition to its other damages.

### G. Medicalgorithmics' Attorneys' Fees and Expenses

Medicalgorithmics argues AMI must indemnify it for its costs and attorneys' fees under Section 15 of the 2014 SAA. That provision states, in relevant part:

> [AMI] shall indemnify, defend, and hold [Medicalgorithmics] harmless from all claims, damages, settlements, expenses, and attorneys' fees incurred as a result of: . . . [AMI's] material breach of this Agreement, including any of its representations or warranties in this Agreement.[303]

I have concluded that AMI materially breached the 2014 SAA. This action sought various forms of relief in response to that breach. Consequently, the expenses and attorneys' fees in this litigation were incurred as a result of AMI's material breach.

AMI argues it should not be held responsible for Medicalgorithmics' fees and expenses because they were incurred as a result of Medicalgorithmics' voluntary decision to terminate the SAA and to file suit. This argument is unpersuasive. If a party files litigation to vindicate its rights in response to a material breach, it may be true that the suit and its associated expenses resulted from that party's voluntary decision to litigate, but they are also the result of the material breach itself. Refusing to indemnify expenses for a suit that was filed in

---

[302] Pl.'s Op. Post-Trial Br. 63; 6 *Del. C.* § 2301(a).

[303] 2014 SAA § 15.

response to a material breach by AMI would render the indemnification provision ineffective and is not a reasonable interpretation of "incurred as a result of."[304] The same holds true for Medicalgorithmics' decision to terminate the agreement after the material breach. These expenses are one and the same, because the litigation was filed in order to receive a declaration that the agreement validly was terminated. For these reasons, I award Medicalgorithmics the expenses and attorneys' fees it incurred in this action under Section 15 of the 2014 SAA.[305]

## H.    Declaratory Judgment Regarding PocketECG III Charges

Medicalgorithmics seeks a judgment declaring that it does not owe any alleged overcharges to AMI based on the purchase price of the PocketECG III.[306] This request stems from AMI's contentions that Medicalgorithmics charged it $505 per PocketECG III device under Attachment 4 of the amendment to the 2011 SAA, rather than the $303 that was listed for the PocketECG II in Attachment 2 of the original 2011 SAA and the 2014 SAA.[307]

---

[304] Notably, in arguing that Medicalgorithmics materially breached the SAAs, AMI itself contends that it is entitled to "everything incurred as a result of this litigation" notwithstanding the fact that some of its expenses undoubtedly stemmed from its counterclaims for breach. Defs.' Op./Ans. Br. 73.

[305] For the avoidance of doubt, this award of attorneys' fees does not include expenses for unrelated litigation, including litigation surrounding the potential purchase of Medi-Lynx by Medicalgorithmics.

[306] Pl.'s Post-Trial Op. Br. 64.

[307] 2014 SAA at Attachment 2.

As discussed at several points above, AMI's dispute over the pricing of the PocketECG III was not in good faith. AMI admitted at trial it expected the price of the PocketECG III to be $505 rather than $303, and it recognized the exclusion of Attachment 4 from the 2014 SAA was either inadvertent, or was intended to be followed up by an amendment identical to the amendment to the 2011 SAA.[308] Without Attachment 4, the 2014 SAA has no price for the PocketECG III and does not call for the sale of that device at all; instead, the 2014 SAA (in Attachment 2) lists only the PocketECG II device and its price of $303.

The record suggests that AMI was hoping to trap Medicalgorithmics in a difficult position regarding device pricing in order to renegotiate its agreements in AMI's favor. On January 27, 2015, Joe responded to a lengthy e-mail Dziubinski sent a month earlier discussing their relationship. Joe's response was cryptic, simply noting, "I received your email dated 12/23/2013 [sic] and am thrilled you have achieved your life goals. ☺" and posing a seemingly unrelated question: "Is PECG III an improvement of PECG II or is it a new stand-alone Product?"[309]

The purpose of the e-mail becomes obvious in its full context. On the same day, Joe and AMI's staff were meeting to discuss AMI's strategy against

---

[308] Tr. 728-32 (Joe); *see also supra* Part I.F (discussing omission of Attachment 4 from 2014 SAA).

[309] JX-496.

Medicalgorithmics. That strategy was to have Dziubinski admit that the PocketECG III was an "improvement" so that AMI could claim that it fell under the definition of "Product" under the 2014 SAA and therefore qualified for the price of $303 rather than $505, and to surprise Medicalgorithmics' auditors with allegations of overcharges in order to enhance AMI's negotiating leverage, sabotage the company, or both. As I have explained, AMI did all of those things over the ensuing months, demanding that the price for all of their previously ordered PocketECG III devices be reduced.

AMI's strategy relies on the omission of Attachment 4 from the 2014 SAA, which the parties did not intend. The merits of AMI's strategy are unpersuasive, in particular because all of the purchase orders between the parties listed the higher price of $505 plus interest.[310] These orders already fell outside the terms of the 2014 SAA and its attachments because they did not require AMI to prepay for the devices. Instead, they allowed AMI to order devices without prepaying, provided that AMI would pay the agreed price of $505 plus interest.[311]

---

[310] JX-207. As mentioned previously, the price for these orders was $513.83 rather than $505, reflecting the interest accruing in lieu of prepayment.

[311] In addition, the PocketECG III, although more expensive than the PocketECG II, would obviate the need for AMI to procure a separate smartphone device. *See supra* note 14 and accompanying text.

For these reasons, I conclude that AMI's pricing dispute was without merit and that the price of the PocketECG III was properly set at a prepayment of $505. The agreed price for devices paid for within 90 days of delivery was $513.83, which included interest. AMI argues that this figure overstates the interest charge and should only be $510.85.[312] This figure comes from an internal e-mail from Zolkiewicz to Dziubinski in which Zolkiewicz calculates $510.85 as the charge including interest.[313] At trial, Dziubinski admitted the possibility that he made a mistake in calculating the final price, including interest.[314] Regardless of any internal calculations, however, the price clearly conveyed to and accepted by AMI was $513.83.[315] That same figure was used in AMI's own purchase orders.[316] Consequently, AMI's claim that it was overcharged by $2.98 per device based on a calculation within an internal Medicalgorithmics e-mail is without merit—as well as miniscule.

---

[312] Defs.' Op./Ans. Post-Trial Br. 26 n.18.

[313] JX-192.

[314] Tr. 197 (Dziubinski).

[315] JX-190.

[316] JX-208.

AMI has failed to present any other evidence of overcharging. Thus, Medicalgorithmics is entitled to a declaration that it does not owe AMI for any alleged overcharges relating to the price of the PocketECG III.

## IV. CONCLUSION

For the foregoing reasons, Medicalgorithmics is entitled to a declaratory judgment that it validly terminated the 2014 SAA. AMI and Spectocor are jointly and severally liable to Medicalgorithmics for damages in the amount of $253,482.08 plus prejudgment interest,[317] and for Medicalgorithmics' costs and attorneys' fees incurred in this litigation. Medicalgorithmics also is entitled to a declaration that it is not liable to AMI for any alleged overcharges concerning the price of the PocketECG III device, and to entry of judgment in its favor dismissing all of AMI's counterclaims with prejudice. The parties are directed to confer and to submit a final judgment and order in accordance with this opinion within ten business days.

---

[317] *See Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).